UNITED STATES DISTRICT COURT

DISTRICT OF CONNECTICUT

N-12-3

FILED
2013 FEB 22  P 2: 37
U.S. DISTRICT COURT
NEW HAVEN, CT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO. 3:13cr41(RNC) |
| | : | |
| v. | : | |
| | : | Violations: |
| DAVID BRYSON, | : | |
| BART GUTEKUNST and | : | 18 U.S.C. § 371 [Conspiracy] |
| RICHARD PEREIRA | : | 15 U.S.C. §§ 78j(b), 78ff [Securities Fraud] |
| | : | 18 U.S.C. § 1343 [Wire Fraud] |

## INDICTMENT

The Grand Jury charges that at all times relevant to this Indictment:

### The Defendants and Their Co-Conspirators

1.  New Stream Capital, LLC, ("New Stream") was an unregistered investment adviser and asset management company that served as the general partner and investment manager to New Stream Secured Capital, L.P. (the "Master Fund"), which operated as a specialty finance company focused on funding transactions in various industries such as real estate and life settlements, in other words, a hedge fund. New Stream was headquartered in Ridgefield, Connecticut.

2.  Defendant DAVID BRYSON ("BRYSON") was a Managing Partner of New Stream and one of three principals who owned and controlled New Stream.

3.  Defendant BART GUTEKUNST ("GUTEKUNST") was a Managing Partner of New Stream and one of three principals who owned and controlled New Stream.

4.  Defendant RICHARD PEREIRA ("PEREIRA") was the Chief Financial Officer of New Stream.

5. An individual referred to herein as "Co-Conspirator #1" was a senior executive at New Stream.

6. An individual referred to herein as "Co-Conspirator #2" was an employee of New Stream whose position involved marketing and client relations.

## Relevant Terms

7. "Senior investors" was a term used to describe investors who, in the event of a liquidation, would suffer investment losses only after subordinate investors lost their whole investments. New Stream described senior investors as holding "senior debt" or having "seniority."

8. "Subordinate investors" was a term used to describe investors that would suffer full losses of their investment before any senior investors lost any of their investment. New Stream described subordinate investors as holding "subordinate debt" or being "subordinated."

9. "Subordination" was a term used to describe the process of making certain investments subordinate to other investments.

10. "Note Purchase Agreements" were contracts used to govern the sale of debt from the Master Fund to New Stream's Feeder Funds. The debt itself was memorialized by a document called a "Note."

11. "Redemption" was the term for the removal of an investment, that is, an order by an investor to take the investor's money out of the fund.

## Background

12. Prior to approximately November 2007, New Stream managed the Master Fund through two principal lines of investment. U.S.-based investors invested directly in the Master

Fund by holding equity shares in the Master Fund itself. Foreign-based investors invested in an offshore fund based in Bermuda ("the Bermuda Fund"), which made investments in the Master Fund by issuing debt to the Master Fund. As a result of the debt-equity distinction between the U.S. and foreign investors, the investors in the Bermuda Fund were in a senior position to the investors in the Master Fund, that is, if New Stream were forced to liquidate, U.S. investors in the Master Fund would take all investment losses before the foreign investors in the Bermuda Fund would take any losses.

13. In approximately November 2007, New Stream finalized plans for a new investment structure. As part of the new structure, New Stream launched new feeder funds that would manage investments of both U.S. and foreign investors, specifically a U.S. Feeder Fund ("U.S. Fund") to take investments from U.S-based investors and a series of feeder funds in the Cayman Islands ("Cayman Fund") to take investments from foreign-based investors (collectively, the "Feeder Funds"). New Stream designed the Feeder Funds to hold a mixture of equity in the Master Fund and debt issued to the Master Fund. New Stream originally planned for the restructuring to lead to the closure of the Bermuda Fund. To account for any time period during which certain investors may have remained in the Bermuda Fund and not yet transferred to the Cayman Fund, New Stream planned to issue debt to the Feeder Funds that was equal in priority to the debt held by the Bermuda Fund.

14. On or about November 20, 2007, BRYSON and GUTEKUNST executed an "Amended and Restated Collateral Agency Agreement" ("November 2007 Collateral Agency Agreement"). The November 2007 Collateral Agency Agreement was dated November 16, 2007 and, among other things, detailed in paragraph 5(n) how losses would be prioritized if New

3

Stream ever had to liquidate the Master Fund. Under the terms of the November 2007 Collateral Agency Agreement, the debt held by the Feeder Funds and the Bermuda Fund would share the same priority.

15. On or about November 28, 2007, Co-Conspirator #2 distributed New Stream's promotional materials announcing the formation of the Feeder Funds. The announcement stated that the new Feeder Funds were the way "through which investors can continue to participate in NSSC (the 'Master Fund')." It also stated that as of December 1, 2007, the Bermuda Fund "will be closed to new direct investments." The announcement requested that all U.S. and foreign investors "transfer their existing positions to the Feeder Funds. Transfers may begin on December 1, 2007 and should be completed by January 1, 2008." New Stream, through Co-Conspirator #2, attached an organizational chart to the announcement that outlined how the U.S.-based and foreign-based fund structure would look.

16. Between December 1, 2007 and March 17, 2008, GUTEKUNST and Co-Conspirator #1 executed new Notes and Note Purchase Agreements between the Feeder Funds and the Master Fund. The Note Purchase Agreements stated that they were subject to the terms of the November 2007 Collateral Agency Agreement. Consistent with the November 2007 Collateral Agency Agreement, the debt held by the Feeder Funds was equal in priority to any debt still held by the Bermuda Fund.

17. Between approximately December 2007 and March 2008, a number of investors in the Bermuda Fund and Master Fund transferred their investments into the Feeder Funds, while the defendants and others at New Stream solicited investments in the Feeder Funds from new investors.

18. On or about March 17, 2008, GUTEKUNST and Co-Conspirator #2 met with New Stream's biggest investor ("Investor #1") at New Stream's offices in Ridgefield, Connecticut. Investor #1 was a foreign fund and was invested in the Bermuda Fund, having not transferred its investment to the Feeder Funds. In the meeting, GUTEKUNST and Co-Conspirator #2 informed representatives from Investor #1 that the investors in the Feeder Funds held debt that was equal in priority to the debt held by the Bermuda Fund. The representatives from Investor #1 viewed the lack of seniority as a material change to the safety of their investment and they advised GUTEKUNST and Co-Conspirator #2 that they planned to redeem their investments in New Stream.

## COUNT ONE
(Conspiracy)

19. Beginning on or about March 17, 2008, and continuing to at least in or about September 2010, the exact dates being unknown to the Grand Jury, in the District of Connecticut and elsewhere, the defendants BRYSON, GUTEKUNST, and PEREIRA, and others known and unknown to the Grand Jury, did unlawfully, knowingly and intentionally conspire, combine, confederate and agree with each other and others, both known and unknown to the Grand Jury:

    a. to devise and intend to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises and omissions, and for the purpose of executing and attempting to execute the scheme and artifice did knowingly transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds, in violation of Title 18, United States Code, Section 1343; and

b.  by use of the means and instrumentalities of interstate commerce, and the mails, directly and indirectly, to use and employ manipulative and deceptive devices and contrivances in violation of Title 17, Code of Federal Regulations, Section 240.10b-5 ("Rule 10b-5"), in connection with the purchase and sale of New Stream securities, by (i) employing devices, schemes, and artifices to defraud purchasers and holders of New Stream securities and other members of the investing public; (ii) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit on purchasers and holders of New Stream securities and other members of the investing public, in violation of Title 15, United States Code, Sections 78j(b) and 78ff(a) and Title 17, Code of Federal Regulations, Sections 240.10b-5.

## Purpose of the Conspiracy

20. The purpose of the conspiracy was for the defendants and their co-conspirators to obtain and retain investments in New Stream by fraudulently misrepresenting and omitting material facts regarding the existence and seniority of the Bermuda Fund to certain potential and existing investors in the Feeder Funds, by falsely representing to certain investors in the Bermuda Fund that their investment had always been senior to the investments in the Feeder Funds, and by misrepresenting to investors the amount of redemptions New Stream faced. It was also the purpose of the conspiracy to conceal the conspiracy from others.

## Manner And Means Of The Conspiracy

21. The manner and means by which the defendants and others, both known and unknown to the Grand Jury, sought to accomplish the objects of the conspiracy included the following:

   a. It was part of the conspiracy that the defendants and their co-conspirators developed a plan to persuade Investor #1 to remain invested in New Stream by telling Investor #1, among other things, that New Stream had always treated, and always intended to treat, the Bermuda Fund as senior in priority to the debt held by the Feeder Funds.

   b. It was further part of the conspiracy that the defendants and their co-conspirators created new fund documentation and provided it to Investor #1 in an effort to convince Investor #1 to rescind its redemptions and remain invested with New Stream.

   c. It was further part of the conspiracy that the defendants and their co-conspirators misrepresented the level of redemptions to existing and prospective investors.

   d. It was part of the conspiracy that the defendants and their co-conspirators concealed the ongoing existence of the Bermuda Fund from existing and prospective investors in the Feeder Funds, by, among other things: (1) sending organizational charts to existing and prospective investors in the Feeder Funds that failed to include the existence of the Bermuda Fund, and (2) omitting the existence of the Bermuda Fund when asked about leverage.

   e. It was part of the conspiracy that after informing investors that the Bermuda Fund was closing and that investors in the Bermuda Fund must transfer to the Cayman Fund to remain invested in New Stream, the defendants and their co-conspirators offered certain

investors the opportunity to stay in the Bermuda Fund and allowed an investor to leave the Cayman Fund and invest in the Bermuda Fund.

### Overt Acts

22. In furtherance of the conspiracy, and to accomplish its purposes and objects, the defendants and their co-conspirators, both known and unknown to the Grand Jury, committed and caused others to commit at least one of the following overt acts, among others, in the District of Connecticut and elsewhere:

    a. On or about March 17, 2008, BRYSON emailed GUTEKUNST, PEREIRA, Co-Conspirator #1 and Co-Conspirator#2 and instructed them to "Say nothing do nothing delay delay delay," in response to the news that representatives from Investor #1 planned to redeem their investment because they no longer held seniority in the investment structure.

    b. On or about March 18, 2008, BRYSON emailed GUTEKUNST, copying Co-Conspirator #1 and a lawyer that worked at New Stream ("Attorney #1"), with the draft version of a false story to deceive Investor #1's representatives. In the email, BRYSON wrote, "HOW ABOUT SOMETHING LIKE THIS IF YOU HAVE TO" and then outlined the contours of a fabricated story, suggesting that GUTEKUNST tell Investor #1: (i) that the Bermuda Fund was senior to the Feeder Funds; (ii) that New Stream always intended Investor #1's investment to be senior to the new funds; and (iii) that PEREIRA assured GUTEKUNST that the year-end audit would reflect that seniority.

    c. On or about March 18, 2008, GUTEKUNST emailed BRYSON draft versions of the fabricated story that GUTEKUNST would send to Investor #1.

   d. On or about March 18, 2008, GUTEKUNST emailed representatives from Investor #1, falsely stating "I want to clear up some confusion as best I can by email. First it is, and has always been, our intent that your Bermuda investment would remain senior. After checking with my CFO, he assures me that the Bermuda debt has been treated as senior and that the year-end audit would reflect that."

   e. On or about March 18, 2008, BRYSON, GUTEKUNST, Co-Conspirator #1 and PEREIRA caused Attorney #1 to draft documents subordinating the debt held by the Feeder Funds to the Bermuda Fund. Attorney #1 did so and circulated them in an email where she wrote that the documents "reflect the changes necessary to subordinate the Feeder Funds to the Bermuda Fund."

   f. On or about March 25, 2008, PEREIRA spoke to one of New Stream's outside auditors ("Auditor #1") about reclassifying the Bermuda Fund debt as senior to the Feeder Funds' debt and adjusting New Stream's 2007 financial statements accordingly.

   g. On or about March 26, 2008, BRYSON signed a new Collateral Agency Agreement, subordinating the U.S. and Cayman Fund debt to the Bermuda Fund.

   h. On or about March 26, 2008, Co-Conspirator #2 emailed a copy of the new Collateral Agency Agreement to Investor #1, copying BRYSON and GUTEKUNST.

   i. On or about March 26, 2008, Co-Conspirator #2 emailed BRYSON, PEREIRA and Co-Conspirator #1, attaching a copy of a Cayman Fund's draft directors' resolution, which agreed to subordinate its debt investment in exchange for a more favorable rate of return.

j. On or about March 31, 2008, New Stream emailed a representative of a U.S.-based entity invested in the U.S. Fund ("Investor #2") a copy of an organizational chart that failed to include the Bermuda Fund.

k. On or about April 1, 2008, GUTEKUNST executed new Note Purchase Agreements subordinating the Cayman Fund debt to the Bermuda Fund.

l. On or about April 1, 2008, GUTEKUNST and Co-Conspirator #1 executed new Note Purchase Agreements subordinating the U.S. Fund debt to the Bermuda Fund.

m. On or about April 1, 2008, BRYSON sent an email to a New Stream employee who worked in investor relations ("Investor Relations Staffer #1") requesting the employee to send him marketing materials, which included an organizational chart that did not show the existence of the Bermuda Fund.

n. On or about April 1, 2008, PEREIRA caused a representative of New Stream's outside auditors ("Auditor #2") to send him draft financial statements showing reclassified senior subordinated and subordinated notes.

o. On or about April 7, 2008, PEREIRA and GUTEKUNST signed a management representation letter for New Stream's external auditors stating that New Stream had made available to the auditors all data related to their financial records when, in fact, they failed to disclose to the auditors how New Stream changed its fund documents after March 17, 2008.

p. On or about April 17, 2008, BRYSON emailed GUTEKUNST discussing, among other things, Investor #1's pending redemption writing, "Still no cancellation of the 300mm."

q. On or about April 28, 2008, GUTEKUNST spoke with a representative of a U.S.-based investment entity invested in the U.S. Fund ("Investor #3"). Investor #3 had placed redemptions on some of his investments. During the call, GUTEKUNST attempted to convince the representative from Investor #3 to rescind his redemptions. In doing so, GUTEKUNST represented that New Stream was facing normal levels of redemptions and did not disclose Investor #1's pending redemption.

r. In or about April or May 2008, Attorney #1 met with Co-Conspirator #1 and informed him of her legal opinion that, when asked about leverage, New Stream representatives should inform investors about the Bermuda Fund. Co-Conspirator #1 indicated that he would not follow Attorney #1's advice.

s. On or about May 8, 2008, BRYSON emailed a representative from Investor #1, asking Investor #1 to rescind its redemptions because New Stream management was "feeling increasingly uncomfortable in communicating its redemption levels with existing and prospective investors."

t. On or about June 5, 2008, BRYSON and GUTEKUNST met with a representative of Investor #3 at New Stream's offices in Ridgefield, Connecticut. In the meeting, GUTEKUNST misstated the redemption levels that New Stream was facing and did not mention Investor #1's pending redemptions.

u. On or about June 11, 2008, GUTEKUNST and Investor Relations Staffer #1 met in Ridgefield, Connecticut with representatives from a foreign investment entity that was invested in the Cayman Fund ("Investor #4") to discuss their investments with New Stream. GUTEKUNST failed to inform the representatives from Investor #4 that the Bermuda Fund still

existed and that the debt held by Investor #4's investment in the Cayman Fund had been subordinated to the Bermuda Fund.

    v. On or about June 25, 2008, GUTEKUNST forwarded an email to BRYSON and Co-Conspirator #1, among others, informing them that Investor #4 intended to make an additional $1 million investment in New Stream.

    w. On or about June 27, 2008, Co-Conspirator #2 emailed BRYSON, GUTEKUNST and Co-Conspirator #1 informing them that a foreign entity invested in New Stream's Cayman Fund ("Investor #5") had learned that Investor #1 had placed full redemptions and that Investor #5 was placing a full redemption as a result.

    x. On or about June 27, 2008, Co-Conspirator #1 responded to Co-Conspirator #2's email, emailing BRYSON and Co-Conspirator #2 and copying GUTEKUNST, asking, "…and who told them all this was going on?"

    y. On or about August 7, 2008, BRYSON met with representatives from Investor #5 and agreed to allow them to transfer their investment from the Cayman Fund to the Bermuda Fund.

    z. On or about August 15, 2008, New Stream emailed a foreign investment entity that was contemplating an investment in New Stream's Cayman Fund ("Investor #6"). The email contained a due diligence questionnaire that New Stream had answered. New Stream's responses in the due diligence questionnaire falsely stated that New Stream had not had any structural changes since its inception and failed to describe the leverage that the Bermuda Fund was providing to the Master Fund.

aa.    On or about October 8, 2008, GUTEKUNST spoke to representatives from a foreign investment entity that had been invested in the Bermuda Fund, but had moved to the Cayman Fund based on New Stream's representations that it had to transfer from the Bermuda Fund to the Cayman Fund ("Investor #7").  Investor #7 had placed redemptions on its investments.  In the conversation, representatives from Investor #7 discussed their pending redemptions, and GUTEKUNST failed to disclose that New Stream had subordinated the debt held by the Cayman Fund to the Bermuda Fund.

bb.    On or about October 17, 2008, GUTEKUNST received an email from Investor #2.  The email asked GUTEKUNST if there were "any senior debt or investors that have seniority in the capital structure.  Specifically, do any investors in New Stream have any structure where they are senior to other investors?"  Rather than respond to Investor #2, GUTEKUNST forwarded the email to Co-Conspirator #2, adding, "I'll come down."

cc.    On or about October 23, 2008, Co-Conspirator #2 emailed an employee who worked in investor relations ("Investor Relations Staffer #2") requesting that he email Investor #2 to "say that [GUTEKUNST] is traveling and sent you an email from the road asking you to coordinate a time to talk with one of the partners next week."

dd.    In or about June 2009, BRYSON and Co-Conspirator #1 met with representatives from Investor #1 in an attempt to persuade Investor #1 to share a portion of any liquidation proceeds with the Feeder Funds.  In the conversation, BRYSON and Co-Conspirator #1 informed Investor #1's representatives that if Investor #1 attempted to press the Bermuda Fund's senior position in a bankruptcy proceeding, Investor #1 would in essence open a "can of worms."

ee. On or about September 28, 2010, BRYSON held a conference call with representatives of Investor #7 to discuss, among other things, the Bermuda Fund. In the call, BRYSON failed to disclose that New Stream had subordinated the debt held by the Cayman Fund to the Bermuda Fund.

All in violation of Title 18, United States Code, Section 371.

## COUNTS TWO THROUGH ELEVEN
(Securities Fraud)

23. The allegations set forth in paragraphs 1 through 18 and paragraphs 20 through 22 of Count One of this Indictment are hereby realleged and incorporated as though set forth in full herein.

24. On or about the dates set forth below, within the District of Connecticut and elsewhere, defendants BRYSON, GUTEKUNST, PEREIRA, and others, known and unknown to the Grand Jury, using the means of interstate commerce, as described below, did knowingly and willfully use and employ manipulative and deceptive devices and contrivances and directly and indirectly: (i) employ devices, schemes, and artifices to defraud; (ii) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (iii) engage in acts, practices, and courses of business which would and did operate as a fraud and deceit upon members of the investing public, in connection with the purchases and sales of New Stream securities and by the use and of the instruments of communication in interstate commerce and the mails, each such use constituting a separate count of this Indictment:

| COUNT | DATE | FROM | TO | USE OR MEANS OF INTERSTATE COMMERCE |
|---|---|---|---|---|
| 2 | March 18, 2008 | BRYSON | GUTEKUNST, copying Co-Conspirator #1 and Attorney #1 | Email providing GUTEKUNST with the fabricated story to tell Investor (1 |
| 3 | March 18, 2008 | Attorney #1 | BRYSON, GUTEKUNST, PEREIRA, and Co-Conspirator #1 | Email attaching draft documents necessary to subordinate the Feeder Funds to the Bermuda Fund |
| 4 | April 1, 2008 | Investor Relations Staffer #1 | BRYSON | Email attaching organization chart without Bermuda Fund to be used in marketing meeting |
| 5 | April 28, 2008 | GUTEKUNST | Investor #3 | Phone call regarding, among other things, New Stream's redemption levels |
| 6 | May 8, 2008 | BRYSON | Investor #1 | Email requesting that Investor #1 rescind its redemptions |
| 7 | June 25, 2008 | GUTEKUNST | BRYSON, Co-Conspirator #1, among others | Email regarding $1 million in new investments from Investor #4 |
| 8 | June 27, 2008 | Co-Conspirator #1 | BRYSON, Co-Conspirator #2, copying GUTEKUNST | Email regarding defensive redemption of Investor #5. |
| 9 | October 8, 2008 | GUTEKUNST | Investor #7 | Phone call regarding redemptions |
| 10 | October 17, 2008 | GUTEKUNST | Unindicted Co-Conspirator# 1 | Email regarding Investor #2's question about seniority |

| 11 | September 28, 2010 | BRYSON | Investor #7 | Phone call regarding Bermuda Fund and Cayman Fund |

In violation of Title 15, United States Code, Sections 78j(b) and 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5; and Title 18, United States Code, Section 2.

## COUNTS TWELVE THROUGH NINETEEN
(Wire Fraud)

25.     The allegations contained in the paragraphs 1 through 18, 20 through 22 and 24 are hereby realleged and incorporated by reference as if fully set forth herein.

26.     On or about the dates set forth below, the defendants BRYSON, GUTEKUNST, and PEREIRA, and others known and unknown to the Grand Jury, knowingly and willfully and with intent to defraud devised and intended to devise a scheme and artifice to defraud investors and creditors and to obtain money and property from investors and creditors by means of materially false and fraudulent pretenses, representations and promises, which scheme and artifice is in substance as set forth previously in this Indictment, and did transmit, and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures and sounds for the purpose of executing such scheme and artifice, to wit, on or about the dates listed below, the defendants sent, or caused to be sent, the following emails in furtherance of the scheme, each use of the wires constituting a separate count of this Indictment:

| COUNT | DATE | FROM | TO | USE OF INTERSTATE WIRES |
|---|---|---|---|---|
| 12 | March 18, 2008 | GUTEKUNST | Investor #1 | Email telling Investor #1 that New Stream always intended for their Bermuda Fund investment to have seniority |
| 13 | March 31, 2008 | Investor Relations Staffer #1 | Investor #2 | Email providing Investor #2 with New Stream's offshore/onshore organization chart that did not include the Bermuda Fund |
| 14 | April 1, 2008 | Auditor #2 | PEREIRA, copying Auditor #1 among others | Email with draft financial statements showing changes to the language about senior subordinated notes |
| 15 | June 25, 2008 | Investor #4 | GUTEKUNST, Investor Relations Staffer #1 | Email regarding $1 million in new investments from Investor #4 |
| 16 | August 6, 2008 | Investor Relations Staffer #2 | Investor #6 | Email to Investor #6 that attached New Stream's org chart that failed to include the Bermuda Fund. |
| 17 | August 15, 2008 | Investor Relations Staffer #2 | Investor #6 | Email attaching due diligence questionnaire with answers that failed to mention the structural changes at New Stream or the leverage caused by the Bermuda Fund's seniority |
| 18 | August 18, 2008 | Investor #5 | BRYSON and Investor Relations Staffer #1 | Email from Investor #5 thanking BRYSON for allowing them to transfer their investment from the Cayman Fund to the Bermuda Fund |

| 19 | October 8, 2008 | Investor #7 | GUTEKUNST | Email from Investor #7 following a phone call regarding redemptions |

All in violation of Title 18, United States Code, Sections 1343 and 2.

A TRUE BILL

/s/
_____
FOREPERSON

*David B. Fein*
_____
DAVID B. FEIN
UNITED STATES ATTORNEY

_____
LIAM BRENNAN
ASSISTANT UNITED STATES ATTORNEY

_____
MICHAEL McGARRY
ASSISTANT UNITED STATES ATTORNEY