UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : : : : : : : : : : | CRIMINAL CASE NO. 3:13-CR-00041 (JCH) |
| v. |  |  |
| DAVID BRYSON et al., Defendants. |  | JANUARY 12, 2015 |

**RULING RE: FINDINGS OF FACT**

On May 21, 2014, defendants David Bryson ("Bryson"), Bart Gutekunst ("Gutekunst"), and Richard Pereira ("Pereira") pled guilty to Count One of the Second Superseding Indictment, conspiracy to commit wire fraud in violation of section 371 of title 18 of the United States Code.  On November 17-21, 2014, December 2, 2014, and December 4, 2014, the court conducted a Fatico evidentiary hearing regarding factual issues in dispute related to sentencing.[1]

Principally at issue in the hearing were the Guidelines loss amount and relatedly the number of victims.  Bryson and Gutekunst, along with one other person, were partners of New Stream Capital, LLC ("New Stream"), a hedge fund headquartered in Ridgefield, Connecticut.  Pereira was New Stream's Chief Financial Officer and Chief Compliance Officer.  The government has alleged that, as a result of the conspiracy, a number of investors were fraudulently induced to invest with New Stream as a result of material misrepresentations and omissions by the defendants.

---

[1] The court credits any testimony or other evidence it cites herein, unless it is apparent from context that the court is citing the testimony or evidence for the purpose of rejecting it.

1

**I.       DISCUSSION AND FINDINGS**

   A.      Background

The court assumes knowledge of the general background of the case, but provides a brief description as follows.   Prior to December 2007, New Stream's structure included a Master Fund, in which U.S. investors could invest directly, and a Bermuda-based fund ("Bermuda Fund") for non-U.S. investors which invested in the Master Funds by making loans to the Master Fund.   The investors in the Bermuda Fund were senior in priority to those in the Master Fund.   Put another way, investments in the Master Fund were subordinate to those in the Bermuda Fund.

In late November 2007, New Stream announced a new fund structure to its investors.   Under the new structure, New Stream would open new onshore and offshore funds (the "U.S. Fund" and the "Cayman Fund," respectively), in which all investors would be pari passu.   New Stream further announced that the Bermuda Fund and Master Fund would be closed to new investments, and asked all investors to transfer their existing positions into the new structure.   The announcement stated that "transfers may begin on December 1, 2007 and they should be completed by January 1, 2008."   Government Exhibit ("G. Exh.") 12.

   B.      March 2008 Meeting with Gottex

Gottex Fund Management Ltd. ("Gottex") was New Stream's largest investor, with over $300 million invested in the Bermuda Fund.   At the time the new fund structure went into place on December 1, 2007, Gottex had not yet agreed to transfer its holdings from the Bermuda Fund into the new structure.   D Exh. 174; D Exh. 234.

As of March 2008, Gottex remained invested in the Bermuda Fund, despite New Stream's prior statement that transfers "should be completed by January 1, 2008."

On March 17, 2008, representatives from Gottex met with Gutekunst and Tara Bryson, the head of New Stream's marketing department.  In the course of this meeting, Gutekunst represented to Gottex that Gottex's investment in the Bermuda Fund was <u>pari passu</u> with the debt held by the U.S. and Cayman Fund investors.  Lai Testimony, Tr. 301:6.  This information "alarmed" the Gottex representatives, who at that point understood Gottex's investment as senior in the structure.  G. Exh. 65. Gottex threatened to redeem its full investment and, in fact, did so shortly thereafter.[2] After the meeting, Gutekunst—following several drafts back-and-forth with Bryson—emailed Gottex representative J.P. Bailey in an attempt to "clear up" his statements and persuade Gottex to remain invested with New Stream.  He stated that ". . . it is, and has always been our intent, that your Bermuda investment is and would remain senior," that "my characterization of the debt [as <u>pari passu</u>] . . . was not correct," and that "we will move immediately to clarify the seniority of the Bermuda fund for as long as there are outstanding investments in that fund."  G. Exh. 36.  Soon after, New Stream executed a new Collateral Agency Agreement, which solidified Bermuda's seniority in the capital structure in the event of liquidation.

Following this meeting, it was clear to the defendants that the Bermuda Fund, instead of being eliminated, would be both remaining in the capital structure and senior

---

[2] These redemptions remained pending until August 2008, when they were eventually rescinded by Gottex following several months of negotiations.

to all investments in the new fund structure.[3]   However, after March 2008, New Stream continued to market its new funds to investors as if the Bermuda Fund did not exist, and to represent that the restructuring plan set forth in November 2007—in which the Bermuda Fund would close and all investors would be pari passu—was still on track. As set forth in the following sections, in some cases defendants intentionally made or directed others to make statements or omissions to investors that constituted material misrepresentations to investors.

### C. Misrepresentations and Omissions made to Post-March 2008 Investors

Both affirmative misrepresentations and the omission of information that the defendant has a duty to disclose may serve as the basis for wire fraud.   See U.S. v. Autori, 212 F.3d 105, 118 (2d Cir. 2000).   Further, "it is just as unlawful to speak 'half truths' or to omit to state facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading."   Id.   While a duty to disclose may be based on a fiduciary duty, which is not the case here, it can also arise "in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading."   Id. at 119.

#### 1. Absolute Return Partners, LLP

Absolute Return Partners, LLP (ARP) invested $2.5 million in the Cayman Fund on September 1, 2008.   Prior to investing, ARP undertook a due diligence process, and ARP representatives met several times with New Stream employees, including

---

[3] Absent Gottex's voluntary transfer to the new structure, the only way for New Stream to eliminate the Bermuda Fund would be by redeeming Gottex's $300 million plus investment, which they were unable to do at that time.   The record does not show any serious, viable efforts made by New Stream to enable such a redemption following the March 2008 meeting.

4

David Bryson.  See Ward Testimony, Tr. 1028:2-14; G. Exh. 124.  ARP also submitted a number of questions as part of a "due diligence questionnaire."  On August 6, 2008, New Stream marketing employee Christopher Floeter sent an email to Jan Vilhelmsen of ARP, which included responses to the due diligence questionnaire.  G. Exh. 75.  Among others, the questionnaire contained the question, "Have there been any material changes in investment strategy since inception? (e.g. reduced/increased leverage, new markets?)," to which the response was, "No."  The questionnaire also contained the question, "Is leverage used? If so, how much? Is it allocated to all positions or just certain ones? If leverage fluctuates, who determines the level?"  The response given to this question stated, in relevant part, "We currently have only a $30mm liquidity facility that is drawn approx. $15mm"—a response that clearly did not include the approximately $400 million Bermuda Fund.  The email also included as an attachment an organizational chart of the fund structure that did not include the Bermuda Fund.

Given the circumstances in which they were made, the court finds that these statements were misleading.  First, by omitting the Bermuda Fund, the organizational chart misrepresented the fund structure in which ARP would be investing.  ARP did not find out about the Bermuda Fund until a meeting in late 2008, after the investment had been made.  See Ward Testimony, Tr. 1032:6, 1045:17-23; G. Exh. 124.  Second, the responses to ARP's questions misrepresented New Stream's leverage, in that they failed to account for the Bermuda Fund.  A number of people who testified, including Tricia Ward from ARP and several New Stream employees, stated that they would have considered the Bermuda Fund to be leverage and that investors inquiring about

5

leverage would have wanted to know about the Bermuda Fund's existence. See, e.g., Ward Testimony, Tr. 1033:12-21; Floeter Testimony, Tr. 198:14-201:7; Lai Testimony, Tr. 314:5-19; Logue Testimony, Tr. 519:23-520:16; Beattie Testimony, Tr. 918:5-13; Frank Testimony, Tr. 688:9-13; Thorley Testimony, Tr. 593:6-9. The court finds in this context that the Bermuda Fund was leverage.

Further, the record shows more than one reference to the Bermuda Fund as leverage by New Stream employees, including internal emails strategizing about Gottex between Bryson, Gutekunst, and New Stream President Perry Gillies, and the monthly internal financials presented by Pereira and the accounting department. See G. Exh. 34; G. Exh. 61; G. Exh. 62; G. Exh. 116; Lai Testimony, Tr. 378:5-379:1. Thus, defendants' position now that the Bermuda Fund was not "leverage" in the context in which the question was raised by ARP and other investors is disingenuous. Moreover, the defendants were well aware that at least some of their investors would consider the Bermuda Fund to be leverage, even if (in contravention of the evidence that the court credits above) New Stream itself did not. See Lai Testimony, Tr. 315:24-316:1 (Lai discussed calling the fund leverage with Bryson); G Exh. 61 (email from Gillies to Bryson and Gutekunst with talking points for Gottex meeting, including section on "leverage" in the sense used by Gottex); G. Exh. 62. These misrepresentations as to the fund structure and the amount of leverage were material to ARP's decision to invest. See Ward Testimony, Tr. 1033:24-1034:10, 1036:14, 1037:19.

While the actual email to ARP was sent by Floeter, Floeter testified that the answers in question were prepared with the assistance of Pereira. Floeter Testimony, Tr. 199:11. Further, members of New Stream's marketing team testified that the chart

omitting the Bermuda Fund was the only chart that had been approved for use by the partners, including Bryson and Gutekunst, and that the marketing team understood they were not supposed to mention the Bermuda Fund to new investors.  See Tremblay Testimony, Tr. 407, 409-10; Floeter Testimony, Tr. 196-97; Harper Testimony, Tr. 73-78.  New Stream General Counsel Amanda Logue also testified that Tara Bryson, head of marketing, had been specifically told by Bryson and Gillies not to mention the Bermuda Fund when asked about leverage.  Logue Testimony, Tr. 519-21.  The court finds that the acts and omissions described above were within the scope of the defendants' agreement, and that they were foreseeable, indeed likely directly known, to Bryson, Pereira, and Gutekunst.  Thus, all three defendants are accountable for losses caused by this misrepresentation.[4]

  2.  Fix Family Office

Investor Fix Family Office ("Fix Family") invested $500,000 in the U.S. Fund on June 1, 2008.  Prior to that investment, in April 2008, David Bryson met with the investor.  In preparation for the meeting, New Stream marketing employee Joseph Tremblay sent Bryson the "latest marketing materials" to use at the meeting, which included the organizational chart that omitted the Bermuda Fund (G. Exh. 53).  The court finds that this evidence, along with the evidence previously referenced regarding New Stream's marketing strategy, is sufficient to support a strong and reasonable

---

[4] As stated on the record, the court's discussion of "loss" in this Ruling should not be construed as a technical finding of the loss amount for the purpose of determining the Sentencing Guidelines calculation.  Rather, the court here identifies only the investors who suffered a loss as a result of the conspiracy and the total amount of the relevant investment. As discussed on the record, the parties will submit additional briefing on how the Guidelines loss amount should be calculated based on the court's findings in this Ruling.

7

inference (which the court draws) that Bryson made incomplete representations to Fix Family, which representations required disclosure of the Bermuda Fund to avoid being misleading, and that the information not disclosed was material.  See Tremblay Testimony, Tr. 474.   Further, Bryson's actions were well within the scope of the defendants' agreement to obtain new investments by misrepresenting the fund structure and the amount of leverage, and were foreseeable to Gutekunst and Pereira. Thus, all three defendants are accountable for losses caused by this misrepresentation.

      3.      <u>Finles Capital Management</u>

Investor Finles Capital Management ("Finles") invested a total of $2.15 million into the Cayman Fund in July and August 2008.   Prior to doing so, Finles representatives met with Gutekunst and Tremblay in June 2008.   During the meeting, in which they discussed Finles making a potential new investment, neither Gutekunst nor Tremblay disclosed the continued existence or seniority of the Bermuda Fund,[5] despite the fact that, in November 2007, Finles representatives had been affirmatively told (by Tremblay, following review or input from Pereira) that "we will be transferring all investors from the Bermuda fund to the New Cayman fund over the course of a few months."[6]   G. Exh. 8; G. Exh. 9.   Following the meeting, Finles portfolio manager Dirk van de Geer informed Gutekunst and Tremblay that Finles was "fully reassured with our investment" following the meeting and announcing their intention to make an additional investment.   G. Exh. 70.   The court finds that this evidence is sufficient to support a

---

    [5] See Tremblay Testimony, Tr. 415:10-14; D. Exh. 122.

    [6] Further, at no point prior to the July/August 2008 investments was it disclosed to Finles officials that there had been any changes to the November 2007 plan to move all investors out of the Bermuda

reasonable inference (which the court draws) that Gutekunst made, or allowed to be made, incomplete representations to Finles, which required disclosure of the Bermuda Fund to avoid being misleading, and that the information not disclosed was material.[7] Further, these actions were within the scope of the defendants' agreement to obtain new investments and were foreseeable to Bryson and Pereira. Thus, all three defendants are accountable for losses caused by this misrepresentation.

    4.    MIO

Investor MIO Partners ("MIO") invested $10 million in the Cayman Fund on July 1, 2008. MIO had been invested with New Stream prior to the 2007 restructuring and thus was aware of the existence of the Bermuda Fund. In Spring 2008, Alexander Kisilievich of MIO spoke with Tara Bryson several times. Kisilievich inquired as to the status of the Bermuda Fund closing, and he was told by Tara Bryson that it was going "slowly." Kisilevich Testimony, Tr. 1078:21-1079:12. Kisilievich also testified that it was implied that the size of the Bermuda Fund was shrinking. Id. 1083:11-12. MIO knew of the continued existence of the Bermuda Fund at the time the investment was made, but was not told that the size of the fund was still substantial, or the level of pending redemptions, or that some investors, who represented most of the Bermuda Fund, were refusing to move, or that any investor was demanding (and in fact was allowed) to move back. Id. 1079:12, 1082:24, 1084:8; 1085:5. Kisilevich further

---

Fund. See G. Exh. 123.

[7] Had Finles officials known that the Bermuda Fund still existed and was senior to Finles' investment, they would have put in a redemption request for their entire Cayman investment, and would not have agreed to invest any more money with New Stream as they did in July/August 2008. G. Exh. 123.

9

testified that had MIO known these factors, they would, at the very least, not have made the additional investment in July 2008.

Given the circumstances in which they were made, the court finds that the statements made in Spring 2008 were misleading, in that they gave the impression (and were intended to give the impression) that the plan announced in Fall 2007—in which the Bermuda Fund would close and all investors would be pari passu—was still on track.  In reality, given Gottex's position, the defendants knew by March 2008, that the Bermuda Fund would remain in the capital structure and would remain senior to the U.S. and Cayman Funds, at least for the foreseeable future.[8]  Made in this context, these statements were misleading in their incompleteness, and thus gave rise to a duty to disclose the developments that had taken place at, and following, the March 2008 Gottex meeting.  See U.S. v. Autuori, 212 F.3d 105 (2d Cir. 2000).  Further, these statements were within the scope of the defendants' agreement and were foreseeable to the defendants.  Thus, all three defendants are accountable for losses caused by this misrepresentation.

5. Other Post-March 2008 Investors

In addition to these four investors, a number of other investors made investments into the U.S. or Cayman Funds after the conspiracy began in March 2008. The Government did not present direct evidence as to any specific misrepresentations or omissions made to these investors, but argued that the court should infer that similar

---

[8] By the time these misleading statements were made to get MIO to invest further in the summer of 2008, the efforts to raise money to try to redeem Gottex from the Bermuda Fund had been underwhelming, and clearly unsuccessful.

misrepresentations were made to them regarding Bermuda's existence and seniority prior to investing, based on those made to other investors and potential investors, on testimony from NSC marketing employees on their general instructions, and on the lack of evidence rebutting such an inference for any particular investor.

There is certainly evidence in the record to support an inference, which the court does draw, that, in general, New Stream employees marketed the funds after March 17, 2008, to new investors without disclosing the continued existence of the Bermuda Fund, with its continued senior debt.   See Tremblay Testimony, Tr. 407, 409-10; Floeter Testimony, Tr. 196-97; Harper Testimony, Tr. 73-78; Logue Testimony Tr. 519-21; see also G. Exh. 12, G. Exh. 51, G. Exh. 53, G.Exh. 66, G. Exh. 67, G. Exh. 68, G. Exh. 77. However, there is no evidence in the record that any representations were made to this group of investors, even incomplete statements.   It would be speculative to conclude that misrepresentations were made to all of these investors, and that such misrepresentations were material in inducing them to invest.[9]   Thus, the court declines to consider these investors for the purpose of calculating under the Sentencing Guidelines the loss attributable to the defendants' conduct or the number of victims of the offense.

D.    2007 Financial Statements

Defendants maintain that New Stream's 2007 Audited Financial Statements, which were issued in April 2008, and provided to investors, fully disclosed the existence

---

[9] It is also not clear which of these investors were newly investing with New Stream and which investors were already invested in New Stream but made additional investments after March 2008.

11

and seniority of the Bermuda Fund, and thus the conspiracy terminated as of the date of their issuance and any statements made after their issuance were not fraudulent.

First, the court finds that the 2007 Financial Statements did not provide adequate disclosure of the continued existence and seniority of the Bermuda Fund.   Following the March 2008 Gottex meeting, Pereira directed New Stream's independent auditor, J.H. Cohn, to separate out the Bermuda debt as a separate line item from the debt contained in the U.S. and Cayman Funds under the heading "Liabilities and Partner's Capital."   G. Exh. 43; see Levy Testimony, Tr. 967:11.   The Bermuda debt was listed as "Senior subordinated notes" and the U.S./Cayman debt was listed under "Subordinated notes."   Prior to these changes, both Bermuda and U.S./Cayman debt had been included in the draft year end financials under the heading "Senior subordinated notes."   Pereira further directed edits to a footnote (Note 8) related to these line items.   Note 8, as edited and captioned "Senior subordinated and subordinated notes," included the statement that "the subordinated notes are subordinate to the senior subordinated notes."   G. Exh. 17.   The footnote also included a reference to the Bermuda fund, stating that, "One of the investment groups, New Stream Capital Ltd., is owned and controlled by Butterfield Trust (Bermuda), Ltd. and is managed by NSC.   At December 31, 2007, amounts due to New Stream Capital, Ltd. were $499,281,527."   Id.

Defendants argue that these changes fully disclosed the continued existence and seniority of the Bermuda Fund to investors after March 2008.   The court disagrees.   Note 8 provides no description, by way of name of fund, of which entities hold "subordinated" or "senior subordinated" notes which would allow U.S./Cayman

12

investors or potential investors to realize that their debt was subordinated to that of the Bermuda Fund. Further, and perhaps more importantly, this Note only references the status of the Bermuda Fund as of December 31, 2007, not April 2008.[10] The "subsequent events" section of the financial statement makes no reference to the decision to retain the Bermuda Fund as senior following the Gottex meeting, in contravention of the plan broadcast to investors in November of 2007. Rather than disclosing the existence and seniority of the fund, the 2007 Financial Statements allowed the defendants to placate Gottex on the one hand, while on the other hand keeping U.S./Cayman investors and potential investors in the dark.[11]

Second, even if the 2007 Financial Statements did disclose the existence of the Bermuda Fund, they cannot excuse or cancel the misrepresentations later made to investors—for example, the statements made about New Stream's leverage. See, supra, at 5-7. Thus, the conspiracy did not terminate with the issuance of the 2007 Audited Financial Statements in April 2008; rather, it continued throughout the summer and fall of 2008.

E. Other Misrepresentations and Omissions

In addition to investors who invested with New Stream after the onset of the conspiracy, the court also heard evidence related to investors who had invested in the

---

[10] That the Bermuda Fund still existed in December 2007 might not have raised concern with investors, since the plan as advertised said that transfers "should be completed" by January 1, 2008. Most investors appear to have understood this to mean that the new structure and the Bermuda Fund would co-exist during December 2007.

[11] Further supporting the court's conclusion, supra, at 12, is the testimony of several investors that the financial statements did not or would not have disclosed the continued existence and seniority of the Bermuda Fund at the time they were issued, April 2008. See, e.g., Thorley Testimony, Tr. 597:23; Cremer Testimony, Tr. 646:16.

U.S./Cayman Funds in Fall 2007. At the time they invested, these investors were told that all investors would be transferring into the new structure. At the time these statements were made, the record indicates that they accurately reflected the intentions of New Stream and the individual defendants—i.e., that they actually intended (in hindsight, it would appear to have been more like wishful thinking) for the Bermuda Fund to close. Thus, these investors were not fraudulently induced to invest. However, following the March 2008 meeting with Gottex, the defendants knew that the Bermuda Fund would remain in the capital structure for the foreseeable future, thus altering the plan that they had advertised in the fall in which all investors were pari passu and the Bermuda Fund ceased to exist. Despite this fact, defendants made representations intended to mislead investors as to the continued existence and seniority of the Bermuda Fund. The court highlights several instances as follows. In each case, the actions taken fell within the scope of the defendants' agreement and were foreseeable to each individual defendant.

On March 31, 2008, investor David Frank of Stonehaven requested information on the "exact structure" of the "onshore/offshore master feeder structure" as it had been relayed to him at meetings the previous fall. See G. Exh. 51. In response, Tremblay sent him the organizational chart from the approved marketing materials that did not depict the Bermuda Fund. For the reasons stated previously, supra at 5, this response was misleading in that it did not include the Bermuda Fund, which at this point the defendants knew would be remaining in the capital structure. Frank testified that knowing about the Bermuda Fund and its senior status would have been important and relevant to his investment decisions. See Frank Testimony, Tr. 688:17, 695:6-17,

696:4-9.  Further, for similar reasons as stated previously, supra at 7, the omission of the Bermuda Fund from the marketing materials, and the dissemination of those materials to investors, was within the scope of the agreement and foreseeable to the defendants.

Misrepresentations were also made to investor ZAM Asset Management ("ZAM").  In an August 2008 phone call, Matthew Thorley of ZAM asked Gutekunst to confirm whether all investors were treated pari passu, which Gutekunst confirmed.  Thorley Testimony, Tr. 591:17-592:5.  At the time this statement was made, the Bermuda Fund's seniority in the capital structure was clear and ongoing.  Indeed, Bryson and Gutekunst were expressly stating to Gottex that they were senior to investments like ZAM's.  G. Exh. 36; G. Exh. 38.  In November 2008, Thorley further inquired as to confirmation that New Stream "has no leverage."  G. Exh. 78.  Tara Bryson responded with reference only to New Stream's $30 million liquidity facility, and she did not reference the Bermuda Fund.  G. Exh. 81A; Thorley Testimony, Tr. 595:6-12.  For the same reasons as stated previously, supra at 5-6, this response misrepresented the amount of New Stream's leverage by failing to include the Bermuda Fund.  Thorley testified that knowing where they stood in the fund structure would be "absolutely vital" in making decisions regarding their investment.  Thorley Testimony, Tr. 581:16.  Thorley also asked Tara Bryson, in the summer of 2008, "how did everything go with Bermuda," and was told that one or two investors hadn't transferred because they were not allowed to have equity exposure.  Thorley testified that this

15

conversation gave him the impression, and reasonably so, that those investors had exited the fund completely (i.e., had been redeemed).[12]  Id. at 588:5-589:4.

The court also heard testimony from Matthew Beattie of investor Tradex. Tradex had invested with New Stream in Fall 2007, and considered making another investment in May 2008.   See G. Exh. 69.   In making its initial investment, Tradex had explicitly sought to invest in Bermuda because of its seniority; however, they were told by Gutekunst that they could not, but that it was a moot point because Bermuda would be closing shortly.   Beattie testified that Gutekunst was the "main guy" Tradex representatives spoke with about their investment, though they also spoke to Bryson. Beattie Testimony, Tr. 914:6.   Tradex representatives met with or spoke to New Stream representatives multiple times in Spring 2008 for quarterly updates and monthly calls.   Beattie testified that the purpose of those calls was to see if there were any material changes in the investment philosophy, and that Tradex representatives would have normally first focused on whether any large redemptions had been put in. Beattie Testimony, 916:4-15.   However, the fact that the original plan to close the Bermuda Fund had been altered was never disclosed in these communications, nor

---

[12] ZAM had previously been invested in the Bermuda Fund, but was told their position needed to be transferred to the new structure.   Thorley Testimony, Tr. 562:5-10.   Prior to transferring, ZAM had also submitted a full redemption for one of its fund classes in the Bermuda Fund.   In January 2008, ZAM was told they had to transfer all of their holdings to the Cayman Fund, and then resubmit the redemption to the Cayman Fund.   Thorley testified that this seemed reasonable in the context of the Bermuda Fund being closed, in which case redemption proceeds could not be paid out from the Bermuda Fund.   Id. at 585:10-20.   In January 2008, Thorley and Michiel Prins from ZAM also spoke with Pereira, who relayed to them, in response to ZAM's concerns about leverage, that New Stream would disclose a monthly transparency report that would provide updated disclosure on the level of leverage on the portfolio.   Id. at 568:24-569:18.   Prins and Thorley also met with Bryson approximately a week later, and expressed that they would like to be informed of any redemptions.   Id. at 574:5-15. The defendants did not inform ZAM of Gottex's redemption following the March 2008 meeting, and the true amount of leverage—which would have included the Bermuda Fund—was not disclosed.

was the Bermuda Fund's seniority to Tradex's investment or the pending redemptions from Gottex.   When Tradex was considering making an additional investment, representative Ken Marshall emailed Gutekunst asking whether there were "any changes in the deal flow in terms of the quality, in terms of pricing, two, any increase in delinquencies or impairments in the underlying loads."   G. Exh. 72.   Gutekunst's response did not reference any of the developments that had taken place following the Gottex meeting.[13]   Beattie testified that, had they known in Spring 2008 that Tradex's investment was junior to the Bermuda Fund, they would have immediately looked to redeem.   Beattie Testimony, Tr. 909:16.   This evidence is sufficient to support a reasonable inference that Gutekunst made incomplete representations to Tradex representatives, which gave required disclosure of the developments that had taken place with the Bermuda Fund following the Gottex meeting to avoid being misleading, and that the information not disclosed was material.

However, despite the fact that material misrepresentations were made to these other investors, the record does not appear to support an inference that these misrepresentations caused loss.   Even if the investors had been told the truth and then put in redemptions in Spring 2008, the record seems to suggest that they would likely have still suffered the same loss following the gating of the fund and eventual

---

[13] The court also viewed evidence—a 304 FBI Interview Notes with Roy Callahan—with regard to another investor, Stratos.   However, the credibility of several key points relating to whether misrepresentations were made to Stratos—namely, the timing of Stratos's redemptions and whether Callahan was aware of the Gottex redemption in 2008—is called into question by other evidence of record, namely contemporaneous emails and voicemails from Callahan.   Thus, on the record before it, the court cannot find that material misrepresentations were made to Stratos.

bankruptcy proceedings.[14]   However, it is not clear that that is the correct reading of the record.   Thus, the government can attempt to demonstrate loss as to this group of investors (namely, Stonehaven, Tradex, and ZAM) for the purposes of calculating the Guidelines loss amount and number of victims in its briefing.

**III.   CONCLUSION**

Based on the foregoing, the court now finds that there were at least four separate victims of the conspiracy—namely, ARP, Fix Family, Finles, and MIO.   These victims were, together, induced to invest a total of $15.15 million based on defendants' material misrepresentations, and each of them suffered a loss.[15]   The court has left open whether another category of investors, see supra at 17-18, may also have suffered a loss.   As discussed on the record, the parties will now submit briefs on the issues of the Guidelines loss calculation and whether the offense involved sophisticated means.

---

[14] The fund was gated in October 2008. Redemptions submitted to the U.S. or Cayman funds took 90 days to crystallize, and so would have had to be submitted prior to July 1, 2008 in order for them to crystallize by October.   Moreover, even if investors had submitted redemptions immediately after the March 2008 meeting, it is not clear that they would have been paid out prior to October 2008, or that investors who had submitted redemptions received a higher payout in the eventual bankruptcy.
   Amy Lai testified that the Bermuda Fund's prospectus had a provision allowing the managers to delay paying redemptions for up to a year; it is not clear if the U.S. and Cayman Funds had a similar provision.   Lai Testimony, Tr. 366:24-25.

[15] The court reiterates that this does not represent a final finding as to the loss amount for the purposes of calculating the Sentencing Guideline, as discussed supra note 4.

**SO ORDERED.**

Dated this 12th day of January, 2015 at New Haven, Connecticut.

                                                /s/ Janet C. Hall
                                              Janet C. Hall
                                              United States District Judge