**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | No. 3:13-CR-41 (JCH) |
| | : | |
| v. | : | |
| | : | |
| DAVID BRYSON, | : | January 26, 2015 |
| BART GUTEKUNST, and | : | |
| RICHARD PEREIRA, | : | |

**GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING**

The United States of America, by and through its attorney, the United States Attorney for the District of Connecticut, hereby submits the following memorandum in aid of sentencing David Bryson, Bart Gutekunst and Rich Pereira.  The sentencing hearings are currently scheduled before this Court for March 23, 24, and 25, 2015.

For the reasons set forth in the Pre-Sentence Report ("PSR") and those set forth below, the Government asserts that the loss amount attributable to defendants Bryson, Gutekunst and Pereira, should be found to be greater than $50 million as set forth in the respective PSRs (Bryson PSR at ¶240; Gutekunst PSR at ¶ 240; Pereira PSR at ¶ 248).  Additionally, a two-level increase should be included for the use of sophisticated means (Bryson PSR at ¶240; Gutekunst PSR at ¶ 240; Pereira PSR at ¶ 248) and an additional two-level adjustment should be included as to each defendant for use of a special skill and abuse of a position of trust. (*See* Pereira PSR at ¶ 251; U.S.S.G. § 3B1.3)

**I.      BACKGROUND**

The offense conduct is accurately summarized in each of the respective PSRs at ¶¶ 8-102. (*See* Bryson PSR at ¶¶ 8-102; Gutekunst PSR at ¶¶ 8-102; Pereira PSR at ¶¶ 8-102.)  Moreover, the Court heard approximately six (6) days of testimony and was provided hundreds of pages of

1

exhibits during the multi-day *Fatico* hearing.  The Government asserts that the evidence introduced at the hearing (and supplemented with the attachments herein) establishes beyond a preponderance of the evidence the Government's version of the offense, including the fact that additional investors other than those discussed specifically at the hearing, should be included as victims and the money they invested and ultimately lost should be included in the Court's loss calculation.

In that regard, it is important to note that at the hearing the Government established the scope of the defendants' conspiracy as charged in the indictment, including establishing that as part of the conspiracy, "on or about March 26, 2008, Bryson signed a new Collateral Agency Agreement, subordinating the U.S. and Cayman Fund debt to the Bermuda Fund." (*See* Second Superseding Indictment at ¶22 Doc. No. 196).  This fact is important because it was *part of the charged conspiracy* and integral to the conspiracy -- not merely incidental to it -- that the then existing investments of the U.S. and Cayman Fund investors were made subordinate to the Bermuda Fund.

Additionally, at the *Fatico* hearing, the Government did not endeavor to admit all of the evidence gathered in the investigation, nor did the Government attempt to admit evidence of misrepresentations made to each and every victim investor.[1]  Further, as set forth below, the

---

[1] Given the Court's findings that there was no evidence introduced into the record with respect to a number of other investors who invested after the March 17, 2008 Gottex meeting, and given the importance that the Court's findings may ultimately have with respect to the victims' rights and their ultimate relative positions with respect to restitution, the Government is attaching hereto additional exhibits that provide a definitive factual basis underpinning the additional findings that *at least* another seven funds were lied to either through specific misrepresentations and material omissions and undoubtedly should be considered in the loss calculation and for restitution.  However, as detailed below, the Government asserts that *all* the victim-investors that invested post-March 2008 in the U.S. and Cayman Funds lost their investments as a direct and proximate cause of the defendants' acts/  The defendants concealed from them the size and seniority of the Bermuda Fund.  The testimony at the Fatico hearing and common sense dictate that no one would have invested in the U.S. and Cayman Funds had they known that they would be subordinate to a $300 million Bermuda Fund.  Accordingly, they are all victims.  *See United*

2

Government asserts that the Cayman and U.S. Investors who invested with the defendants prior to the Gottex meeting, but whose relative seniority was changed and placed junior to the Bermuda Fund should be considered victims.  But for (and as a result of) the conspiracy and the conspiratorial acts, which included the drafting and execution of the new versions of the Collateral Agency Agreements that subordinated the Cayman and U.S. Feeder Funds (*see e.g.* PSRs ¶¶ 33-40) these investors would have been on the same footing as those in the Bermuda Fund and would have received a greater share in the distribution from the Bankruptcy Court.

## II.        The defendants Caused a Loss of Over $50 Million

As discussed at length during the *Fatico* hearing, the defendants made material misrepresentations to their investors including those who moved from the old structure to the new structure (including ZAM and MIO Partners), those who invested in the new structure before the defendants executed a new Collateral Agency Agreement making the U.S. and Cayman Feeder Funds junior to the Bermuda Fund (including TRADEX and Stonehaven), and those who invested more than $54 million after the March 17, 2008 Gottex meeting and after the defendants executed the documents that made the U.S. and Cayman Feeder Funds junior to the Bermuda Fund.

These groups of investors were each defrauded by the defendants.  Accordingly, they are all victims.  *See Marino*, at 320-21.  *Accord Archer*, 671 F.3d at 170-71; *Paul* at 676-77.  As the Second Circuit reasoned in *Paul,* the pertinent question is whether the losses can be considered losses resulting from the crime to which the defendants pleaded guilty – in this case, conspiracy. *See  Paul,* 634 F.3d at 676.  Here there was no doubt a causal nexus.  The size of the loss

---

States v. Marino, 654 F.3d 310, 320-21 (2d Cir. 2011).  *Accord United States v. Archer*, 671 F.3d 149, 170-71 (2d Cir. 2011); *United States v. Paul,* 634 F.3d 668, 670 (2d Cir. 2011).

suffered by the Pre-Gottex Meeting Investors was caused by the subordination of their investments, which as testimony established was a central part of the fraud. The loss to the Post-Gottex Meeting Investors was caused by the making of the investments in the first place and the defendants' inducement of those investments. *See Id.* at 677-78.

A. **The Post-Gottex Meeting Investors**

Turning first to the group of investors who invested approximately $54 million after the defendants met with Gottex and executed documents to make the U.S. and Cayman Feeder Funds junior to the Bermuda Fund, it is clear that this group invested based on materially false and fraudulent representations. First, as the Court has already found, the evidence at the *Fatico* hearing clearly established that the members of the marketing department marketed the New Stream funds without disclosing the continued existence of the Bermuda Fund with its substantial senior debt. These were the approved marketing materials and that is what they were instructed to tell investors and potential investors. (January 12, 2015 Ruling Re: Findings of Fact (hereinafter "January 12, 2015 Ruling") at 4-10.) Based on the testimony of the members of the marketing department, which the Court has credited, it follows that these Post-Gottex meeting investors *necessarily* invested based on material false information because that was the only type of information that the defendants and their employees were providing. Second, each and every victim-investor witness who was called to testify testified that if he or she had known the true facts about the New Stream Funds, they would not have invested their money. In this regard, in addressing victims in the context of restitution, the Second Circuit's decision in *Archer* is instructive. In *Archer,* the Second Circuit in addressing whether certain payments to a defendant should be considered as part of the fraud, stated the following:

> The showing required to satisfy the government's burden on this point varies depending on the circumstances of the fraud.  In some cases, it will be clear that no reasonable person would have given the defendant her money if she had known of his plan—as in the fraud in [*United States v. Ojeikere*, 545 F.3d 220, 222 (2d Cir 2008)] where the defendant's plan was to abscond with his co-conspirators' funds as soon as he got hold of their money. 545 F.3d at 223.  *See also United States v. Marino*, 654 F.3d 310 (2d Cir. 2011).  In those cases, a generalized description of the fraudulent scheme is enough to support restitution.  But where it is plausible that some individuals would have paid the defendant even if they had been informed of his fraudulent plan, then the government must proffer some individualized evidence to meet its burden of showing that each alleged "victim" was actually a victim. *Cf. United States v. Gonzalez*, 647 F.3d 41, 65–67 (2d Cir.2011) (vacating a restitution award where the district court failed to calculate individualized and actual losses).

*Archer,* 671 F.3d at 172.

Based on the testimony presented at the *Fatico* hearing, which was not only definite but emphatic, it is simply not plausible that large sophisticated funds such as Atlas Capital, AA Partners, Stillwater Capital Partners, let alone any other investors, would have invested with New Stream if they had been informed of the defendants' plan.  These investor-victims would clearly not have invested had they known or been told that they were investing in a fund that had over $300 in senior debt above them, was facing redemptions possibly as high as $300 million, was run by individuals who routinely lied about leverage, and instructed their employees to falsify answers in Due Diligence Questionnaires.  *See Marino*, 654 F.3d at 322 (noting "that a[n] [ ] investor may meet the causation requirement of the statutory definition of "victim" without showing individual reliance.  The very nature of the crime—concealment—indicates the harm deemed to result from public ignorance in the securities fraud context.  And, in any event, we may presume that had appellant disclosed the crime in a timely fashion, no investor would have invested fresh cash.")

This broader group, the Government contends, should not only include the victim-investors for which witnesses were called and about which particular documents were introduced, but should also include all the other investors who invested after the Gottex meeting as recorded as of April 1, 2008 and later.  (*See* GX 119; Bankruptcy Order attached at Tab 9).

Defrauding these investors was part of the same conspiracy.  The money went into the same Master Fund as was used by the defendants in their failed attempt to keep New Stream afloat.  All the funds were used indiscriminately in the scheme and the funds from these investors were gathered together and redistributed through the bankruptcy and a greater share of their funds went to those in the Bermuda Fund based on the seniority.  Even if the Court were to conclude that these victims were not victims of the precise scheme, the Second Circuit has repeatedly held, "the court in 'determining the amount of loss for purposes of calculating the offense level for a fraud, [must] include 'all such acts and omissions that were part of the same course of conduct or common scheme or plan as the offense of conviction.'" *United States v. Carboni*, 204  F.3d 39, 47 (2d Cir. 2000) (*quoting United States v. McCormick*, 993 F.2d 1012, 1013 (2d Cir. 1992) (quoting U.S.S.G. § 1B1.3(a)(2)).   Taking money from these additional investors after the Gottex meeting was clearly the result of acts that were part of (if not the precise conspiracy) a common scheme or plan.  Accordingly, the Court should include the losses suffered by all the Post-Gottex Meeting investors on Exhibit 119 totaling $54 million.

In its January 12, 2015 Ruling, the Court observed that there was no specific evidence presented in the record that any misrepresentations or material omissions were made to a portion of this group of investors.  The Court further stated that it would be speculative to conclude that misrepresentations were made to all of these investors, and that such misrepresentations or

omissions were material.  January 12, 2015 Ruling at 11.  The Government respectfully

disagrees and requests the Court reconsider this conclusion, particularly in light of the fact that

the Court squarely found that the defendants raised over $15 million through fraud that was

placed into the same Master Fund.  This fact, that is the existence of a multi-million fraud was

clearly not disclosed to the remaining investors, and no doubt would have been material to them.

As in *Archer*, no reasonable investor would have made these investments knowing that such a

fraud was going on in the fund.

      To conclude that these other investors were not misled, the Court would have to conclude

not only did the defendants fully disclose the changed structure, their use of leverage, and the

level of redemptions, but also that the defendants fully disclosed the existence of their conspiracy

to defraud investors of $15 million.  Then the Court would have to conclude that with this

information, the other $39 million worth of investors chose to invest nonetheless.   This simply

does not follow.  Alternatively, the Court would have to conclude that failure to disclose the

crime was not a material omission.  This also does not follow.  *See Marino*, 654 F.3d at 322

(finding "appellant cannot claim that his crime was not a cause in fact—a 'but for' cause of the

investors losses.... [t]hese investors would certainly not have invested in Bayou, as no reasonable

investor would invest in a known Ponzi scheme").

      Additionally, it should be noted that the United States Probation Officers who undertook

the Pre-Sentence investigation, did in fact reach the conclusion that these other investors should

be included in the loss figure.  While the defendants have objected to this finding, they have put

forth no evidence and no cogent arguments as to why their version of the facts (*i.e.*, that the loss

is zero) should be given any weight. To the contrary, the government called numerous credible

witnesses, both employees and investors, to support the finding of the probation office.  The

testimony of employees who participated in the fraud should suffice to prove by a preponderance

of the evidence that the other Post-Gottex Meeting investors are victims and their losses in total

should be considered as part of the loss calculation.  *See United States v. Walker*, 191 F.3d 326,

339 (2d Cir 1999) (crediting testimony of employees for sentencing enhancement).

      Moreover, the victims who were either subpoenaed or agreed voluntarily to testify at the

*Fatico* hearing or those about which particular documents or testimony was offered should not be

separated out as the only victims who suffered a loss and thus the only victims in line to receive

restitution.  This would simply not be equitable.  The Government did not endeavor to present

evidence of misstatements made to each and every investor as the Guidelines merely require a

reasonable estimate of loss.

      To this point, representatives of Atlas Capital Group were recently contacted and

provided nearly an identical recitation of their experience with the defendants as the investor-

victim witnesses who were called to testify.  (*See* Tab 1, at 1-4).  A representative from

Stillwater Capital Partners, Ms. Borg-Brenner, told the interviewing agent that at the time of

Stillwater's investments, Stillwater was not aware that their position was junior to $300 million

of other investments and that New Stream Capital had specifically told Stillwater that there was

no leverage in the Cayman Fund.  (Tab 2, at 1).  Another victim-investor for example, Walter

Schwab who invested from a family trust and lost most of it was not subpoenaed to testify for

practical reasons given his age, but he provided information to the investigating agents that

would support his assertion that he was lied to.  (Tab 3, at 1-2).  His loss should be included and

he should be included in the restitution list.  Based on the foregoing, it would be appropriate for

the court to conclude the other Post-Gottex meeting investors should be included.  *See Archer*

671 F.3d at 171; *Paul,* 634 F.3d at 677.

In the alternative, if the Court still concludes that it is plausible that some of the investors

that invested after March 17, 2008 would have invested with the defendants even if they had

been informed of their fraudulent plan, then the Court can of course require the Government to

proffer some individualized evidence to meet its burden of showing that each alleged "victim"

was actually a victim.  *See Archer,* 671 F.3d at 172.  To this end, the Government has attached

hereto individualized evidence for an additional seven victim-investors who were not called to

testify, but to whom the defendants provided false and fraudulent information or provided half-

truths and invested based on material omissions.  These other Post-Gottex Meeting victims

should _necessarily_ include *inter alia*: Atlas Capital Group, which invested $6.15 million on 4

occasions in 2008 and is domiciled in Guernsey (Tab 1); Stillwater Capital which invested $1.23

million (Tab 2); Walter Schwab, who will turn 86 years old in March of this year, and who

invested $500,000 after the Gottex Meeting (Tab 3); AA Partners which invested $9.2 million

(Tab 4); Harcourt which invested $750,000 (Tab 5); Stone Corporation which invested a total of

$4 million, $2 million in August 2008 and $2 million again in September 2008 (Tab 6); Auda

which invested $3 million (Tab 7).

1.   Atlas Capital Group

Atlas Capital Group ("Atlas") invested $6.15 million between April 1, 2008 and

September 1, 2008.  Atlas, acquired by Sciens Capital Limited, has representatives in London,

UK, and Guernsey.  Atlas received the Organizational chart November 30, 2007 without

Bermuda on it and was unaware it held a senior position to their investment.  (Tab 1 at 5-6).  On

January 29, 2008 David Bryson told Atlas the transfer to the new structure was almost complete and he mentioned that Gottex had **not** put in any redemptions.  (Tab 1, at 7).  On March 25, 2008 Joseph Tremblay e-mailed Atlas and discusses off-shore investing entities and omitted any mention of the Bermuda Fund.  (Tab 1, at 8-10).  On April 28, 2008, Atlas had a call with David Bryson (Tab 1, at 11) where they discussed redemptions and Bryson said nothing about the $300 million redemption Gottex had placed.  March 2009 was the first they learned of the Bermuda Fund.  (Tab 1, at 2-4 and 12).  This was material.  They would not have invested if they knew the truth.

2.  <u>Stillwater Capital</u>

Stillwater Capital ("Stillwater) invested $1.23 million with New Stream between May and July 2008. Stillwater received the Organizational chart November 28, 2007 without Bermuda on it and was unaware it held a senior position to their investment.  (Tab 2, at 4-6).   On February 6, 2008 Tremblay e-mailed Stillwater and stated "we have not [sic] leverage in the off-shore fund" (Tab 2, at 7).  Ms. Borg Brenner had calls with Bryson Floeter and others (Tab 2, at 8) and was never informed about the Bermuda Fund (Tab 2, at 1).  New Stream specifically told Ms. Borg Brenner there was no leverage in the Cayman Fund.  (*Id.*) Stillwater would not have invested if it knew the truth.

3.  <u>Walter Schwab</u>

Walter Schwab invested $500,000 in April 2008.  According to Mr. Schwab, he dealt directly with Defendant Pereira.  Mr. Schwab, who was at the time 79 years old, stated that Defendant Pereira misled him.  At one point as late as September 2008, according to Mr. Schwab, Defendant Pereira was "telling him about how great everything was."  Mr. Schwab does

not recall being told that some New Stream funds were subordinate to others.  (Tab 3, at 1-2).

Mr. Schwab added that he did not wish to travel unless it was necessary.  (*Id*.).

### 4.  AA Partners

AA Partners ("AA") invested $9.2 million from June 6, 2008 through August 1, 2008.

On April 4, 2008 Tremblay sent AA the Organizational chart without the Bermuda Fund on it.

(Tab 4, at 1-5).  In Mid-April, Tremblay met with representatives of AA.  On April 24, 2008,

Tremblay again sent AA the Organizational chart without Bermuda on it.  (Tab 4, at 6-8).   AA

invested after the conspiracy began and received received charts that did not contain the

Bermuda Fund.

### 5.  Harcourt Investment Consulting

Harcourt invested $750,000 on June 1, 2008.  Harcourt was provided the "New" structure

without the Bermuda Fund and told:  New Stream has requested that all previous investments

should be transferred into the new structure so that all investors are *pari passu*  (Tab 5, at 1-2).

On March 18, 2008, Tara Bryson e-mailed Harcourt and stated in the e-mail that the current level

of redemptions was $90 million.  When asked specifically about leverage Tara Bryson stated that

they had an RZB facility that was increased to $30 million drawn down to about $16 million.

Tara Bryson did not mention Bermuda as leverage. (Tab 5, at 3-5).  In fact, Harcourt had been a

Bermuda Fund investors and was told all investors in the Bermuda *had* to move into the Cayman

Fund.

### 6.  Stone Corporation

Stone Corporation ("Stone") invested $4 million: $2 million on August 1, 2008 and $2

million on September 1, 2008.  Mr. Claytor told the interviewing agent that he believed that New

Stream was treating all investors equally and did not realize at the time that Bermuda was senior. Claytor was unaware to the extent that New Stream used Leverage. Claytor would not have invested on behalf of his clients had he known the truth.  (Tab 6 at 1-3).

### 7.  Auda Advisor Associates

Auda invested $3 million on August 1, 2008.  On June 4, 2008, Tremblay sent an e-mail to Auda.  (Tab 7, at 3-4).  The e-mail was in response to a specific question in which Auda asked: "can you please explain your policy on Leverage…" Tremblay stated "to date we have not felt the need to use leverage on any of our asset classes but decided to write our PPM with more flexibility…"

## B.  **The Pre-Gottex Meeting Investors**

As discussed briefly above, the Government further asserts that the victim-investors who invested prior to the Gottex meeting, including those investors, such as ZAM, who moved their investments from the Bermuda Fund into the Cayman Fund because they were told that they had to move, are also victims and also suffered a part of the financial loss.

With respect to this group, the defendants changed the structure of the fund, placed their millions of dollars of investments in a junior position in an effort to placate their largest investor, Gottex, and made misrepresentations and omissions.  The Court has already found this to be the case.  (January 12, 2015 Ruling at 14-18.)  It was clearly part of the conspiracy to subordinate their funds and thus their losses must be considered part of the loss calculation.  *See Marino*, 654 F.3d at 320-21; *Paul,* 634 F.3d at 676-77.

The loss calculation should use the intended loss figure.  "Under the guidelines, 'loss is the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, cmt. n. 2(A). To the extent that

actual loss is being calculated, that figure likely should exclude any amounts subsequently recovered by the victims." *United States v. McCoy*, 508 F.3d 74, 78-79 (1st Cir. 2007). As the Second Circuit stated in *United States v. Carboni*, 204 F.3d 39, 47 (2d Cir. 2000): "Intended loss is tantamount to the probable loss from a particular misstatement [or omission] because one is presumed to intend the natural and probable consequences of one's acts." *Carboni*, 204 F.3d at 47 (quoting *United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir. 1997) *abrogated by Loughrin v. United States*, 134 S. Ct. 2384, 189 L. Ed. 2d 411 (2014) (internal quotations omitted)).

Moreover, once the U.S. and Cayman investors were subordinated, it was clearly foreseeable, probable and even likely that they could lose all or almost all of their investment as a result of their being subordinated to $300 million of senior debt. As the Court stated in *United States v. Turk*, 626 F.3d 743 (2d Cir. 2010): Guideline § 2B1.1

> does not hold defendants accountable only for certain or near-certain losses, but for losses that were "reasonably foreseeable pecuniary harm." § 2B1.1, App. Note 3(A)(i). 'Reasonably foreseeable pecuniary harm" is defined as "pecuniary harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." § 2B1.1, App. Note 3(A)(iv).

*Turk*, 626 F.3d at 750.

The New Stream defendants, just as the defendant did in *Turk*, led their victims to believe they had a more secured investment then they actually did, and used their investment to placate Gottex and prop up their fund. This aspect of the scheme put the entirety of the Pre-Gottex Meeting investors' money at risk. Accordingly, it would be appropriate to view the loss to these investors (as well as the Post-Gottex Meeting investors) under concept of intended loss. *See Hsu*, 669 F.3d at 122 (stating Guidelines "provide that when an investor puts money into a

fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of principal invested"); *United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009) (concluding that district court did not err in calculating loss based on victims' total $9 million investment).  *See generally, United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011) ("Where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will ultimately be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct." (alteration and internal quotation marks omitted)).  As the Second Circuit articulated in *United States v. Lacey*, 699 F.3d 710, 720 (2d Cir. 2012):

> As an initial matter, we agree with several of our sister Circuits that although Application Note 3(E)(ii) "accurately describes the calculation of actual loss," the note "cannot be mechanically followed where intended loss is higher," since the larger intended amount is a better "measure for the defendant's culpability" than is the actual loss. . . . . Thus, a sentencing court need not apply the fair market value as an offset in calculations of intended loss; it need only offset the loss amount by however much it finds the defendant did not intend loss.

Lacey, 699 F.3d at 720 (internal citations omitted).  Accordingly, the Court could use, as the loss figure for the Pre-Gottex Meeting Investors, the entirety of their investment, since that was the amount put at risk.

It is well settled that a "district court need not establish the loss with precision but rather 'need only make a reasonable estimate of the loss, given the available information.' " *United States v. Carboni*, 204 F.3d 39, 46 (2d Cir.2000) (quoting *United States v. Jacobs*, 117 F.3d 82, 95 (2d Cir.1997)).  Given the fact that the full amount of the investments that had been placed

14

with the Defendants prior to the Gottex Meeting were put at risk and suffered a loss because of the Defendants' fraud, the Court should use the entirety of their investments as the loss amount.

The logic behind this is straight forward.  The witnesses from ZAM testified that they had in fact placed a redemption of their investment but were told (albeit falsely) that they **had to** move out of the Bermuda Fund and into the new Cayman structure in order to have their redemption honored.  This was a materially false statement. Had they not been lied to and had their redemption been honored, they would have recovered the full value of their investment. Accordingly, their loss is the full amount of the investment.

Similarly, with Stonehaven and Tradex, both of whom testified, if the defendants had told them the truth they would have, as they testified, fully redeemed their investments.  The subordination coupled with the material omissions, which the Court found, necessarily caused them to suffer the actual loss that they suffered.

Moreover, there was testimony provided at the *Fatico* hearing by Ms. Lai, Mr. Frank, and Mr. Beattie, among others that the investors in the Bermuda Fund received a greater return from the bankruptcy court than the U.S. and Cayman Funds by virtue of their seniority.  Accordingly, the Court can conclude that all the Pre-Gottex Meeting investors would were made subordinate suffered their actual loss of their investment.  Again, simply put, if there had been no conspiracy and if New Stream had been candid with the investors regarding what occurred at the Gottex meeting, there would be no conspiracy and the defendants would not have "caused" the loss. While this precise figure is not known, the Court can reasonably estimate that each investor would have received all or a substantial portion of their investment through a dissolution in

15

which they would have been treated as *pari passu*.  (*See generally* Tab 9 setting forth the bankruptcy claims (in terms of assets under management) and eventual distributions).

What the Court need not do, and what the defendants have suggested an the various hearings, is to engage in speculative hindsight or Monday morning quarterbacking and try to recreate what would have happened to each investment had the fraud had not been committed.   The Court is not required to unscramble the preverbal omelet and engage in a mathematical or computer modeling exercise to give the defendants the benefit of what the outcome might have been had they done with the investment what they had promised.  Many a defendant would like to have a second bite at the apple and have a sentencing court endeavor to guess as to what the loss might have been if they had followed through with what they had promised and compare that to the actual loss, but that is not the procedure in the Guidelines or the case law.  For example, if a defendant were to tell victims that he is buying race horses and will race them in the Kentucky Derby and share any winnings, and then he instead takes the money and spends it on himself,  he does not get to ask the Court to calculate what a race horse would cost, if he had purchased it, and what the odds would be of winning any purses and then tell the victims that as the odds were slim that they would have made money and they would have loss some money -- that their actual loss should be ignored and replaced with a guess-timate of what would have happened if the fraud had not been a fraud.  Thus, the reasonable estimate of loss should be the "Intended loss" the money taken, which is also the actual loss, with no credit for money returned from the bankruptcy as discussed below.

16

### C. **The Loss Should Not Be Reduced By Funds Recoved Thru Bankruptcy**

The United States Sentencing Guidelines Section 2B1.1 cmt. n. 3(E)(i)  clearly and unambiguously states under the heading "Credit Against Loss" that loss should be reduced by "money returned, and the fair market value of the property returned and the services rendered, by the defendant ... to the victim **before the offense was detected**").  U.S.S.G. §2B1.1 cmt3(E)(i)(emphasis added).  A plain reading of the Guidelines instructs the Court that any money provided back to the victim-investors through the bankruptcy would not be a credit against loss.   This plain reading is also supported by *United States v. Stitsky*, 536 F. App'x 98 (2d Cir. 2013) where the Court held "because investors received nothing of value at the time the fraud was uncovered, the district court reasonably estimated the loss to be the principal amount invested by the victims of defendants' fraud." *Stitsky*, 536 F. App'x at 112 (citing *United States v. Hsu*, 669 F.3d 112, 122 (2d Cir. 2012); *Byors*, 586 F.3d at 226; *United States v. Leonard*, 529 F.3d 83, 93 n. 10 (2d Cir. 2008)).

In *Stitsky*, the defendants were convicted of, among other crimes, conspiracy and fraud, for selling "units" in various investment vehicles.  At sentencing the defendants argued that their fraud victims received securities with some value, *i.e.*, the units, in exchange for their investment and thus the loss amount should be offset by the value of those securities.  *Stitsky*, 536 F. App'x 111.  The sentencing court, however, found that investors had "been left with nothing of value when the fraud was uncovered and, specifically, that the Units conferred no value at all on the investors, because the few buildings that Cobalt purchased were all highly leveraged with multiple mortgages and Cobalt did not have the funds or ability to renovate these properties." *Id.*

17

The Second Circuit affirmed and found that "[i]ndeed, even if some of Cobolt properties retained value at the time the fraud was uncovered, as defendants contend, the district court reasonably concluded that the Cobolt securities had no value because there was no realistic possibility that Cobalt would be able to generate a positive return for investors."  *Id*. (citing *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008) ("The reasonable valuation of ... illiquid assets is an exercise best committed to the sound discretion of the district court.").

Furthermore, to the extent that the New Stream Defendants endeavor to argue that the amount of the victims losses should be reduced by the claims they received through the bankruptcy proceeding, this claim should also be rejected.   First, as a matter of principal and consistent with the Guidelines, the defendants do not get credit against loss for money returned after the crime has been discovered.  At the time of the bankruptcy, the U.S. and Cayman Investors had claims with net asset values of over $118 million and received distributions of only $10.1 million. (Tab 9).  The money taken by fraud, not reduced by the bankruptcy returns is the proper measure of the harm.  *See Hsu*, 669 F.3d at 122 (stating Guidelines "provide that when an investor puts money into a fraudster's hands, and ultimately receives nothing of value in return, his loss is measured by the amount of principal invested"); *Byors*, 586 F.3d 222, 226 (2d Cir. 2009) (concluding that district court did not err in calculating loss based on victims' total $9 million investment).  *See generally, United States v. Ferguson*, 676 F.3d 260, 280 (2d Cir. 2011) ("Where some immediate loss to the victim is contemplated by a defendant, the fact that the defendant believes (rightly or wrongly) that he will ultimately be able to work things out so that the victim suffers no loss is no excuse for the real and immediate loss contemplated to result from defendant's fraudulent conduct." (alteration and internal quotation marks omitted)).

18

Moreover, the touchstone is not whether or not the victims did or could receive something back by way of a bankruptcy, from a receiver, or even from forfeiture and subsequent restitution, but how much was taken through fraud and placed at risk.  In *United States v. Vilar*, 729 F.3d 62, 96 n.34 (2d Cir. 2013) the Second Circuit rejected the defendants' arguments that "the amount of actual loss should be calculated at zero because (1) the victims received profits from [their entity] during the course of the scheme, and therefore did not actually lose money; and (2) there [was] enough money in frozen [their entities] accounts to repay each victim."  *Id*. The Second Circuit, per Circuit Judge Cabranes rejected the first argument about the victims making 'profits' because the "defendants should not benefit from attempting to ensure the continuation of their scheme, or from inducing investors to reinvest certain interest payments received."  *Id*. (citing *United States v. Carrozzella*, 105 F.3d 796, 805 (2d Cir.1997),  and citing *Hsu*, 669 F.3d 112, 122 (2d Cir. 2012)).  The Court rejected the second argument holding "nor should defendants' liability be reduced by the amount of money available in [their entity's] bank accounts, because the relevant sentencing guideline permits a sentencing court to credit a defendant with available funds ***only when*** those funds are designated as collateral for the debt owed the victim."  *Id.*  Thus, money returned to the victims after the crime has been discovered is simply not credited against loss.  To do otherwise would simply allow a defendant with money to be able to "buy down" their guidelines enhancement.  This is not an equitable application of the law nor a proper measure of culpability.

The Second Circuit has also found that the same holds true for a purported equity stake in a venture.  The recent case of *United States v. Komar*, 529 Fed. Appx 28 (2013) decided by Summary Order rejects the argument that a victim's equity stake in a partnership should be

applied as an offset to the victims loss amount pursuant to § 2B1.1.  The Circuit Judges, Straub, Raggi, and Droney, rejected the argument that the equity stake served as an offset and found that "the 'loss' was the money that the investors were fraudulently induced to invest in the Partnership, irrespective of the value of the [held underlying] property."  *Id*. at *29.   The defendant in *Komar* further argued that "the value of the [ ] Property should be applied as a credit toward the investors' 'pecuniary harm."  The *Komar* Court similarly rejected this argument and went on to hold that:

> The application notes to § 2B1.1 do not support this argument.  These application notes significantly omit any direction to apply the value of an equity stake as a credit against actual loss, even as they prescribe an offset in two related situations: (1) where money or property is returned to a victim before the offense is detected, *see* § 2B1.1, Application Note 3(E)(i); and (2) where collateral is pledged by the defendant to a victim, *see id.*, Application Note 3(E)(ii).  These provisions, neither of which applies here, demonstrate that the Sentencing Commission knows how to provide for an offset against actual loss, but has chosen not to do so in the circumstances urged by Komar.

*Id*.  *See also*, *United States v. Shuster*, 361 Fed. Appx. 208 (2d. Cir. 2010) (Calabresi, Cabranes, Parker) (finding application note 3(E)(ii) inapplicable and stating "[w]e are unaware of any precedent for treating the kind of investment fraud that appellant was involved in – essentially a Ponzi scheme – as a fraud involving collateral pledged or otherwise provided.").

### III.   The Court Should Not Discount the Loss Calculation by Applying a Civil Securities Fraud "Loss Causation" Analysis

Just as the Court should not reduce the loss amount by deducting amounts returned to investors following New Stream's bankruptcy, the Court should also not apply a civil securities fraud "loss causation" analysis to discount the loss amount for Guidelines purposes.  *See* Defs. Stmt of Law Regarding Loss Causation at 1 (citing *U.S. v. Rutkoske*, 506 F.3d 170, 179 (2d Cir.

2007)).  While the Second Circuit has encouraged district courts to use a loss causation approach in stock fraud cases to calculate loss under the Guidelines, it is inapplicable to the instant matter, where the crime was not a fraud on the market or involving publically traded securities but was a failure to disclose and for many victim-investors the fraudulent inducement of the initial investment.  *See U.S. v. Onua*, 493 Fed.Appx. 209, 211-12 (2d Cir. 2012) ("It is well established that fluctuation in market prices does not excuse a defendant from paying full restitution for monies stolen in the course of a fraudulent scheme.").

In this case, as the Court has observed, the investor victims would not have invested with New Stream had the investors known the truth about the structure, leverage, or other aspects of the investment.  *See, e.g.*, January 12, 2015 Ruling at 10 (finding that "had MIO known these factors, they would, at the very least, not have made the additional investment in July 2008").  Thus, the reasonably foreseeable loss of the defendants' wire fraud conspiracy is the victim's entire investment because the entire investment was procured by false pretenses.  *See. Paul*, 634 F.3d at 677-78 (2d Cir. 2011) (distinguishing *Rutkoske*).  In this regard, the Court in *Paul* found:

> The fact that independent market forces may have contributed to the decline in SLM stock held by Merrill Lynch and Spear, Leeds is irrelevant to the restitution calculation, because the stock was merely securing the fraudulently-obtained loans. The loss to the brokerage houses resulted from Paul's inducement of the loans, and it is for this loss that Paul must provide restitution.

*Paul*, 634 F.3d at 678.  The fraud in this case went to the very nature of the investment itself. The victims would not have made their investments in the first place, had they known they would be subordinate to the Bermuda Fund.  They were lied to in the inducement to invest. Therefore, the defendants are responsible for the loss of the victim's entire investment and not some portion of that amount discounted by market events.

Moreover, the New Stream hedge fund investments are much more analogous to illiquid loan investments than to the stock investments of *Rutkoske* and, thus, are not the type of investment appropriate for a public market loss causation analysis. *See U.S. v. Turk*, 626 F.3d 743, 751 (2d Cir. 2010). In *Turk*, a case involving loans provided by the investor victims to the defendant, the Second Circuit affirmed a wire fraud sentence which did not apply a loss causation analysis. At sentencing, the district court observed that "unlike a stock fraud, the victims [in <u>Turk</u>] had no opportunity to sell at even a loss, and there was likewise no opportunity to wait for a market correction." *Id*. at 747. The Second Circuit agreed noting, with particular applicability to the instant case:

> By definition, a potential result of being an unsecured creditor is the loss of one's interest to the higher-priority interests of secured creditors. That potential result is unremarkable if the unsecured creditors extend credit with full knowledge that they bear the risk of total loss, but the crux of [the defendant's] offense is that she obtained loans by fraudulently leading unsecured creditors to believe that they were secured creditors. Without this deceit, she could not have obtained her victims' money. It follows that a potential direct result of [the defendant's] specific fraudulent act was the total loss of the moneys the individual investors had given her. That is enough to constitute "reasonably foreseeable pecuniary harm."

*Id*. at 750. Similarly here, without deceiving investors about the true nature of the Bermuda Fund, defendants would not have obtained the victims' money. Indeed, the victims in the instant case are much like the victims in *Turk*. The Bermuda Fund is a higher priority creditor, which would not be a problem if the US and Cayman Fund investors had made their investment knowing that the Bermuda Fund existed. Then, just like in *Turk*, the defendants could not have obtained their victims' money. As such, the reasonably foreseeable pecuniary harm is the victim's entire investment. *See also Paul* at 677 (noting that "the loss to Merrill Lynch and

22

Spear, Leeds was not caused by the decline in value of SLM stock but, rather, by the making of the loans in the first instance.").

**IV.**     **The Offense Involved Sophisticated Means**

Few frauds are as sophisticated – as difficult to detect or prosecute – as the case against the defendants.  The defendants perpetrated a fraud on their investors by playing the interest of a set of investors in a fund in Bermuda against those in funds in the U.S. and Cayman Islands, all of which flowed up to a U.S.-based Master Fund.  This structure created layers of documentation, bank accounts, equity sales, notes, note purchase agreements and loan and security agreements that made it nearly impossible to track and detect.  The complex nature of the structure allowed the defendants to forestall investigation by blaming the investors, claiming they simply did not understand the structure or never asked the right questions.  The defendants concealed their crime through the manipulation of their outside auditors and under mounds of electronic data which they shielded from disclosure through the abuse of the attorney-client privilege. The way in which the defendants changed the fund structure by amending the collateral agency agreements, the way they used their in-house counsel and other professionals to amend the documents, the way they misled their outside auditors about the change in the structure and the false marketing materials they used to continue to market the fund involved careful planning and repetitive execution.  In short, in carrying out their scheme, the defendants used sophisticated means.

United States Sentencing Guidelines § 2B1.1(b)(10) provides for a two-level enhancement "[if] the offense otherwise involved sophisticated means."  "'[S]ophisticated means' means especially complex or especially intricate offense conduct pertaining to the

execution or concealment of an offense."  U.S.S.G. § 2B1.1 app. n. 8(B).  The Pre-Sentence

Reports prepared by the United States Probation Officer included the additional two-levels for

use of sophisticated means.  The defendants have interposed objections as to these additional

levels. However, the defendants have provided the Court no reason to disregard the finding of

the Probation Officers.

Each individual step in the scheme need not be intricate or sophisticated in order for

this enhancement to be applicable; rather, it is only necessary that the offense conduct when

viewed as a whole, is notably more intricate than that of a garden-variety fraud scheme.  As the

Second Circuit stated in *United States v. Jackson*, "even if each step in the scheme was not

elaborate, the total scheme [may be] sophisticated [when] all the steps [are] linked together."

*United States v. Jackson*, 346 F.3d 22, 25 (2d Cir. 2003).  *Accord United States v. Cole*, 296

Fed. Appx. 195 (2d Cir. 2008); *United States v. Lewis*, 93 F.3d 1075, 1083 (2d Cir. 1996)

(holding, in tax case, that sophisticated means enhancement applied even when "each step in

the planned tax evasion was simple, [because] when viewed together, the steps comprised a

plan more complex than merely filling out a false tax return").

In *United States v. Regensberg*, 2010 WL 2501042, 1 (2d Cir. 2010) the Court applied

the enhancement when a defendant ran a Ponzi scheme and the execution of the scheme

included "creation of fraudulent [ ] documents, detailed reporting of fake earnings, use of Ponzi

scheme payments to lull his investors, and alteration of an account statement to make it appear

as if he had not lost his investors' money."  *Regensberg*, 2010 WL 2501042, 1 (2d Cir. 2010).

The Second Circuit determined that this conduct over three years was the sort of "repetitive

conduct . . .  [that] demonstrates that more than routine planning was involved," and agreed that

the enhancement for sophisticated means was appropriate.  *Id*.  Here as in *Regensberg*, the

defendants took even more egregious and sophisticated steps to both execute and cover up their

scheme, including sending out false marketing materials and falsely answering detailed due

diligence questionnaires, making misleading statements about levels of pending redemptions,

making false statements about leverage, changing legal documents without informing investors

who had invested millions of dollars, and falsely representing to auditors the true structure of

the fund at various points in time by withholding contracts and thus distributing year-end

audited financials that were not accurate or transparent.

     The Second Circuit, in a recent 2013 case, affirmed the imposition of the sophisticated

means enhancement in a case involving an investment fraud scheme that that had the flowing

characteristics:

> (1) 'lasted several years'; (2) 'reflected very careful planning'; (3) included a
> 'careful effort to conceal the fraud by lying' to business partners, lawyers, and
> investors; (4) 'relied on creating and disseminating marketing publications that
> contained material misrepresentations'; and (5) involved the 'creation of fictitious
> documents for the purpose of convincing investors to give money or not to
> redeem their money from [the defendant].'

*Stitsky*, 536 F. App'x 98, 112 (2d Cir. 2013) (citing *Jackson*, 346 F.3d at 25).  By all accounts,

the defendants' conduct in this case was as sophisticated if not more sophisticated that the

defendant's conduct in *Stitsky*.  First, as was true in the *Stitsky* case, the fraud lasted over a

significant period of time, stretching from March 2008 into 2010 and beyond.  Second, the fraud

involved very careful planning; the defendants had to re-execute their fund documentation to

appease Gottex, but shield it from discovery by the U.S. and Cayman investors.  Similarly, the

defendants adjusted their financial statements in such a way that "allowed [them] to placate

Gottex on the one hand, while on the other hand keeping U.S./Cayman investors and potential investors in the dark." January 12, 2015 Ruling at 13. Third, the fraud involved a concerted effort to conceal the fraud by lying to investors. The Court is well aware that David Frank asked Bart Gutekunst directly via email – in October 2008 – if there were any investors senior to him and the defendants worked diligently to keep him in the dark until the following March. Likewise, Tricia Ward met with the defendants for a significant period of time in October 2008 and despite asking in multiple ways if there were any senior investors, Ward was belittled by Bryson and Gutekunst and made to think that there were no senior investors. This extensive activity to deceive their investors took a concerted effort on the part of the defendants.

Fourth, as in *Stitsky*, the defendants in this matter created and disseminated marketing materials that contained material misrepresentations. Specifically, as established at the hearing, the defendants and other employees acting at their direction, presented organization charts to investors that did not include the Bermuda Fund, lied to investors, falsely completed due diligence questionnaires, and disseminated misleading financial statements while raising additional funds. This type of conduct has been found to be significant in the applicability of this enhancement. *See United States v. Qualls*, 25 F.Supp.3d 248, 253-53 (E.D.N.Y. 2014) (applying enhancement where a defendant had, among other things, created and disseminated marketing materials that contained material misrepresentations, lied to employees and investors in a careful effort to conceal the fraud; and creating fictitious account statement documents to entice further investment and/or deter the withdrawal of previous investments.). Defendant Bryson, Gutekunst and Pereira extended this activity to falsifying not only their marketing materials but due diligence questions, such as the questionnaire they prepared for Absolute Return Partners. In

26

Government Exhibit 75, Section E, New Stream provides "product characteristics" to Absolute Return Partners. It details the existence of the U.S. Fund, Cayman Fund and Master Fund and represents that it has $815 million in assets under management. This gives the impression that those $850 million come from the US and Cayman Funds. However, roughly $400 million of that amount came from the Bermuda Fund, a fund that the defendants completely concealed from their new investors.

Like the defendant in *Stitsky*, New Stream also made a careful effort to conceal its fraud by lying to its numerous investors and its outside auditors. In particular, the defendants lied to Gottex about the temporary subordination of the Bermuda Fund. At the same time, the defendants lied to the onshore investors about the continued existence of the senior Bermuda Fund, the firm's use of leverage, and level of the then pending redemptions. The defendants misled its auditors by withholding documents that subordinated the U.S. and Cayman debt to the Bermuda Fund. As in *Stitsky*, New Stream maintained these lies for, in some instances, a year or more and did so for the purpose of convincing investors to invest additional funds or hold off on redeeming their investments.

It bears mention that in this case, the defendants were sufficiently sophisticated in there methodology that they were able to use legitimate business entities such as J.H. Cohn to issue year-end financial statements that did not accurately represent the true structure of the fund as it had existed at 2007 year end and were sufficiently obtuse in their disclosure as to hide the defendants' fraud. This is also an indication of the sophisticated nature of the fraud *See Wright v. United States*, No. 5:09-CR-00348-FL, 2014 WL 5038344, at *8 (E.D.N.C. May 15, 2014) ("the definition of 'sophisticated means' is not restricted to use of illegitimate business entities").

27

The complex and sophisticated nature of the execution and cover-up of the fraud is further demonstrated by for example, how the defendants directed their general counsel to draft documents that subordinated the U.S. Fund and the Cayman Funds to the Bermuda Fund, how they directed Tara Bryson and Keith Harper to execute the documents necessary to subordinate the U.S. and Cayman Funds to the Bermuda Fund, and how, as mentioned above, the defendants even instructed its outside auditors to change the 2007 Financial Statements in a way that would satisfy Gottex of its senior status without alerting the other investors of their subordinated status. Here, the defendants used a series of layered transactions to hide their fraud. The subordinated investors were invested in the U.S. and Cayman Funds, and the senior investors were in the Bermuda Fund. All of these funds fed into the Master Fund. The defendants were able to hide the subordination of the US and Cayman Fund under a series of documents that they never showed to investors. Then, when the truth came out, the defendants blamed the investors themselves for not knowing the truth – claiming that New Stream always allowed full inspection of its documents or that the investors did not ask the right questions to get the answers they were looking for.

The scheme committed by the defendants in this case were actually more sophisticated than typical investment fraud cases in which courts have applied the sophisticated means enhancement.  For example, in *United States v. Regensberg*, *supra* sophisticated means was found to be applicable where the defendant created fraudulent loan documents, reported detailed fake earnings, and altered an account statement.  In *United States v. Cole*, 296 Fed. Appx. 195 (2d Cir. 2008), the Second Circuit found that fabricating financial statements constituted, at least in part, sophisticated means, where defendant Cole also fabricated financial statements and

28

utilized a mail forwarding service to make it look as though his victims were receiving the financial statements from an address in Nevada, where his shell corporation was located.  In *United States v. Jones*, the Tenth Circuit noted that the defendants' "creation of checks with a home computer, while not requiring considerable technical acumen, added to the scheme's sophistication in that the tactic was designed to avoid detection of fraud." *Jones*, 530 F.3d 1292, 1306 (10th Cir. 2008).  *See also, United States v. Halloran*,  415 F.3d 940, 945 (8th Cir.2005) (applying sophisticated means enhancement where defendant created fraudulent mortgages using "a corporate entity, numerous fraudulent documents and forged notary stamps")

Indeed, even seemingly less sophisticated conduct has been held by Courts to constitute sophisticated means.  For instance, in *United States v. Rettenberger*, 344 F.3d 702 (7th Cir. 2003) the Court found applicable the sophisticated means enhancement where a husband faked an injury and his wife collaborated with him in order to collect insurance.  Clearly, less sophisticated than a hedge fund with hundreds of millions of dollars in which the various investors are unaware of the structure of the fund and in which lawyers, accountants, and other professionals are used to execute and cover-up the scheme.

It took years of litigation to determine the fraudulent nature of the defendants' scheme. The defendants were able to successfully hide many of the most incriminating pieces of evidence behind the veneer of the attorney-client privilege – shielding them from discovery by private litigants, the Securities and Exchange Commission and even federal criminal authorities.  Every single time documents were brought before a federal judge for review, the judge found documents of significant evidentiary value for which no attorney-client privilege

had ever attached.[2]  This was not by accident.  Amanda Logue testified that the defendants marked certain documents as "attorney-client privileged" when legal advice was neither being sought nor being provided, simply to keep them confidential.  For instance, Government Exhibit 34 was the email in which David Bryson provided Bart Gutekunst with the story to tell Gottex – one of the key pieces of evidence in the government's case.  Amanda Logue was copied on the document and its subject is "attorney client priveledge" [sic].  This was withheld from discovery for years, until Judge Mark Kravitz ordered it to be disclosed to the government because its "predominant purpose" was not to seek legal advice.  Similarly, Government Exhibit 63 was a power point presentation that contained highly incriminating statements by David Bryson that he wished to share with Richard Pereira, Bart Gutekunst, Tara Bryson and Perry Gillies. However, he copied these individuals on the email transmitting the power point, but directed the email to Amanda Logue, even though she knew nothing about the subject of the power point.  This effectively kept the document from discovery by the government throughout the grand jury investigation and until well after indictment.  Likewise Government Exhibit 61 was a set of talking points in which the defendants discuss the Bermuda Fund being "leverage" and admit to hiding the level of pending redemptions from other investors. This document was withheld throughout years of grand jury litigation under the pretense of attorney-client privilege, even though no attorney is included on the communication. This conduct clearly constitutes sophisticated means for the purpose of the enhancement.[3]

---

[2] In addition to finding documents for which no attorney-client privilege ever applied, Judge Charles S. Haight also found, in reviewing New Stream's privileged documents, a number of documents that would be subject to the attorney-client protection, but which he determined to fall under the crime-fraud exception.

[3] The level of sophisticated means is also demonstrated by the extent to which the defendants continued to use an aggressive legal posture, particularly with their original counsel, to withhold documents on the assertion of privilege. It even appears that during the *Fatico* hearing held in November and December the defendants possessed a number of the documents that were used purportedly to "impeach" Roy Callahan that were never disclosed by New

## V.        The defendants Abuse of Their Position of Trust

New Stream Capital, a partnership formed between David Bryson, Bart Gutekunst and Donald Porter, billed itself as "a private investment firm managing more than $1 billion in assets for institutions in the US, Europe and Asia." (Tab 8). "An investment manager normally occupies a position of trust." *United States v. Dobish*, 102 F.3d 760, 762 (6th Cir. 1996). The defendants here held such a position and, like the defendant in *Dobish*, "abused that position to defraud [their] victims." *Id.* New Stream was structured in such a way, and the defendants controlled the structure sufficiently, to give them the ability to commit this very difficult-to-detect fraud. Even when investors like David Frank or Tricia Ward tried to verify rumors that there were senior investors invested with New Stream, the defendants were able to continue to prevent them from learning the truth. This is specifically why an abuse of position of trust enhancement should apply.

United States Sentencing Guideline § 3B1.3 provides for a two-level enhancement to the offense level if the defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." In this case, this enhancement applies because the defendants had discretionary control over the victims' money, occupied a position of trust with respect to those funds, and exercised control over the structure of the fund. The control allowed the defendants to change the structure to their investors' detriment but deceive investors into believed that the change never occurred. The fact that they

Stream to the government, even though they appear to have been responsive to the government investigation. The government did not have these documents prior to their submission to the Court at the very tail end of the hearing – years into the investigation. The defendants' explanation as to why the government did not have these documents was that they were located on an external server (which apparently the defendants maintained and had access to) and somehow were therefore not produced or not required to be produced to the government during the grand jury process. Clearly the use of in-house counsel to commit the underlying fraud and then the use of the same outside firm that advised the defendants during the fraud to respond to subpoenas contributed to the difficulty is the victims and the government in discovering the fraud.

were able to market the fund without telling the truth clearly facilitated the commission of and the concealment of the offense in a significant way.

Courts have routinely upheld the enhancement for abuse of a position of trust when a defendant or defendants are investment brokers or when advisers defraud their clients. *See, e.g., United States v. Santoro*, 302 F.3d 76 (2d Cir. 2002); *United States v. Hussey*, 254 F.3d 428 (2d Cir. 2001); *United States v. Hirsch*, 239 F.3d 221, 227 (2d Cir. 2001); *United States v Kaye*, 23 F.3d 50 (2d Cir. 1994). The primary distinction between a case in which the enhancement applies and a typical fraud case where it is not applied is "the extent to which the position provides the freedom to commit a difficult-to-detect wrong." *United States v. Laljie*, 184 F.3d 180, 194 (2d Cir.1999). Such defendants have been trusted by their victims with greater discretion — and thus greater freedom from supervision — enabling them to escape detection. *See Hirsch*, 239 F.3d at 227 ("the defendant's position must involve discretionary authority . . . [and] this discretion must have been entrusted to the defendant by the victim.").

The question of whether or not a defendant was entrusted with discretion is "viewed from the perspective of the victim" *Hussey*, 254 F.3d at 431. Thus, "a court should objectively evaluate whether a reasonable person in the victim's position would view the defendant as occupying a position of trust under the circumstances of the particular case." *Santoro*, 302 F.3d at 76. Put simply, the Court must determine whether the victims "trusted" the defendants with responsibility over their money, whether they expected the defendants to handle the money as they had been told and whether the defendant abused that trust and misused the discretionary authority they were given. In a telemarketing scam where a defendant falsely represents to his victims that he is selling them a product and the goods are never sent and the money stolen, an

enhancement for an abuse of position of trust would not be applicable.  An arm's length fraud is simply that.  But a fraud where the defendant takes control of investment funds, either in a brokerage account or through a hedge fund is an abuse of the position of trust.

In *Hirsch*, 239 F.3d at 225, the defendant ran a Ponzi scheme, with two types of schemes and misrepresentations.  In one the defendant sold certificates that were purported to represent fractional interests in mortgages.  In the other he claimed to place investor money in secured investments.  The defendant instead used the funds from both schemes to fund other obligations. *See id*. at 223.  Hirsh was able to perpetuate his scheme by virtue of his relationships of trust with his investors and "Hirsch used the investors' trust in him to discourage them from demanding their money."  *Id.* at 228.  The court held that because the defendant "was a broker and investment advisor entrusted with investment discretion by his investors and because he had a fiduciary and personal relationship (rather than an arms-length relationship) with his investors, he held a position of trust." Id. at 228.

As stated above, in their press releases, the defendants described New Stream as "a private investment firm managing more than $1 billion in assets for institutions in the US, Europe and Asia." (Tab 8).  David Bryson stated in a press release "over the next year, we see significant opportunities for the deployment of capital based on new streams investment philosophy." *Id.*  In other words, New Stream received its investors' money and made decisions on how to manage it, how to deploy it, what to invest it in. New Stream did not have to consult with its investors before investing $18 million in a Montgomery County, PA residential community. Similarly, New Stream did not have to receive approval from its investors to sell and lease back a luxury rental home in Miami, FL for $2.6 million. Fund managers decided on their own to provide residential value

insurance for $44 million to an equipment manufacturer in Armonk, NY. And to provide $16 million to financing well pipe completions and drilling locations in Liberty County, TX.  Most importantly, New Stream could decide to subordinate the U.S. and Cayman Funds to the Bermuda Fund on its own without approval its investors.  They could decide whether or not to add fund to the Bermuda Fund by letting BCV to transfer out of the Cayman Fund and into the Bermuda Fund. This was all within their discretion – the very badges of a position of trust. The defendants had the freedom and the discretion that the Second Circuit cited in deciding when to apply a position of trust.

Here, the defendants proceeded to abuse that trust to attempt to keep their fund afloat by obtaining new investments and convincing others from redeeming their investments, thus buying themselves additional time, all while still collecting fees for themselves.  Additionally, the defendants here had different sets of investors who were told different things. Bermuda Fund investors like Gottex and BCV on one hand and the new post-March 17, 2008 investors on the other.  The defendants abused their discretionary authority by structuring the investments differently than they had represented and dramatically changed the risk profile of the investors not fortunate enough to be in the Bermuda Fund.  Specifically, when they made material misrepresentations about leverage, redemptions, and seniority, New Stream placed its investors' money in a much riskier asset than it had promised.  Moreover, as was demonstrated at the hearing, many of the investors did not know about this change in structure and the fraud was difficult to detect by virtue of the authority and control that the defendants had over the fund.  As the Court no doubt recalls, Bryson and Gutekunst had signatory power over certain of the funds and could change and did change the structure without informing investors such as Tradex and

Stonehaven.  The defendants clearly abused this discretionary authority, and the two additional levels are applicable.

## CONCLUSION

Accordingly, the Government respectfully requests that the Court find that loss to be more than $50 million and that it apply a two-point enhancement for sophisticated means and another two-point enhancement for an abuse of position of trust.

Respectfully submitted,

MICHAEL J. GUSTAFSON
ATTORNEY FOR THE UNITED STATES,
Acting Under Authority Conferred
by 28 U.S.C. § 515


/s/    *Liam Brennan*
LIAM BRENNAN
Assistant United States Attorney
Federal Bar No. Ct27924
liam.brennan3@usdoj.gov

157 Church Street
New Haven, Connecticut 06510
Tel. (203) 821-3835

35

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2015, a copy of the foregoing was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system.  Parties may access this filing through the Court's system.

/s/ *Liam Brennan*

_____

LIAM BRENNAN
ASSISTANT UNITED STATES ATTORNEY